IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OUR ALCHEMY, LLC, *et al.*,<br><br>Debtors. | Chapter 7<br>Case No. 16-11596-JTD<br>(Jointly Administered) |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ANDERSON MEDIA CORPORATION; ANCONNECT, LLC; ANDERSON MANAGEMENT SERVICES, INC.; CHARLES C. ANDERSON, JR.; JAY R. MAIER; BILL LARDIE; and CHUCK TAYLOR,<br><br>Defendants. | Adv. No. _____<br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### I. INTRODUCTION

1. Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC ("Anderson Digital" and collectively with Alchemy the "Debtors"), by and through his counsel, brings this action, *inter alia*, to avoid as fraudulent transfers various transfers pursuant to which ANConnect—at the behest of and for the sole benefit of its owner, its sole manager, and the officers and directors of itself, its manager and its owners—transferred tens of millions of dollars from ANConnect to affiliates for no value with the intent to hinder, delay, and defraud known creditors such as Alchemy at a time when it was insolvent (or rendered insolvent by virtue

of the transfers) or alternatively, in the zone of insolvency and liquidating its assets and winding down its operations.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

3. The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge.

4. Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES

### A. The Plaintiff

5. Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the Debtors' bankruptcy estates. Plaintiff maintains an office at Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.

6. On July 1, 2016 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, and the cases are being jointly administered under the caption *In re Our Alchemy, LLC, et al.*, U.S.B.C. D. Del., Case No. 16-11596-JTD.

7. Our Alchemy, LLC ("Alchemy") previously known as Millennium Entertainment, was an independent distributor of film and television content across all platforms in North America, including DVD, digital, and video-on-demand platforms. In July 2015, Alchemy agreed

to purchase certain physical home video and digital distribution capabilities from ANConnect, LLC, including, *inter alia*, the purchase of Debtor Anderson Digital, LLC.

B.   **The Defendants**

8.   Defendant Anderson Media Corporation ("Anderson Media") is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 501, Knoxville, TN 37919.  Anderson Media is a closely held private corporation which functions as the holding company for the Anderson family's media empire.

9.   Defendant ANConnect, LLC f/k/a Anderson Merchandisers, LLC ("ANConnect") is a Texas limited liability company with its principal place of business at 421 SE 34th Street, Amarillo, TX 79103.  ANConnect is wholly-owned by Anderson Media and held physical media distribution assets.

10.  Defendant Anderson Management Services, Inc. ("AMS") is a Tennessee corporation with its principal place of business at 265 Brookview Centre Way, Suite 501, Knoxville, TN 37919.  AMS is wholly owned by Anderson Media and is the sole Manager of ANConnect.  AMS provides senior management and financial advisory services to Anderson Media and its affiliates.

11.  Defendant Charles C. Anderson, Jr. (a/k/a Charlie Anderson) is an individual with a place of business at 265 Brookview Centre Way, Suite 501, Knoxville, TN 37919.  Defendant Anderson is the chair of the board of directors of Anderson Media, President/Chief Executive Officer of Anderson Media, and the Sole Director of AMS, in which capacity he controls ANConnect.

12. Defendant Jay R. Maier is an individual with a place of business at 265 Brookview Centre Way, Suite 501 Knoxville, TN 37919. Defendant Maier is the Chief Financial Officer/Secretary of Anderson Media and the Secretary of ANConnect.

13. Defendant Bill Lardie is an individual with a place of business at 5601 Granite Parkway, Suite 1400, Plano, TX 75024. Defendant Lardie is the Chief Executive of ANConnect.

14. Defendant Chuck Taylor is an individual with a place of business at 265 Brookview Centre Way, Suite 501 Knoxville, TN 37919. Mr. Taylor is the Chief Financial Officer of ANConnect.

15. Defendants Anderson, Maier, Lardie, and Taylor are referred to collectively herein as the "Director/Officer Defendants."

## IV. FACTS

### Anderson Media

16. Anderson Media is the ultimate parent of a conglomerate of direct and indirect subsidiaries which originated in 1916 as a lean-to newsstand in Florence, Alabama, eventually rising to prominence as one of the largest wholesalers and distributors of books, magazines, movies, and other media in the United States.

17. As described in a report prepared by a court-appointed examiner in the 2009 bankruptcy of Anderson Media affiliate Anderson News, LLC, which at the time was one of the largest magazine wholesalers in the United States, "what started as a makeshift newsstand almost a century ago evolved into a family empire of businesses that, among others, have included or contemplated (1) sales of beef jerky, (2) distribution of books and music, (3) manufacture of acrylic and wood display fixtures, (4) sales of fireworks and (5) provision of magazine merchandising and distribution services."

4

18. Since inception, Anderson Media has been owned and controlled by the Anderson family, of which Defendant Anderson is the patriarch.

19. Anderson Media operates as an integrated unit with its subsidiaries, including ANConnect and AMS, which it dominates and controls. Anderson Media generates consolidated balance sheets which include its subsidiaries and conducts board meetings at which the Anderson Media board of directors makes decisions concerning the operation of subsidiaries such as ANConnect and AMS.

**Anderson Media Is Forced To Pivot In The Face of a Rapidly Changing Industry**

20. While Anderson Media had historically dominated traditional forms of media, the advent of widely available high-speed internet throughout the United States led to a sea change in the media industry, with consumer preferences shifting from traditional physical media – i.e., books, DVDs, and CDs – to digital streaming and download services such as Netflix, Kindle, and iTunes. Indeed, from 2014 through 2018, global physical media sales declined by a staggering 48%, dropping from $25.2 billion in 2014 to $13.1 billion in 2018.

21. Defendant Anderson saw the writing on the wall, as described in an October 18, 2010 article in the Knoxville News Sentinel entitled "Entrepreneur seeks new channels as media goes digital":

> It's an irony of the media business these days and part of Charlie Anderson's evolution as an entrepreneur that he couldn't find a way to distribute magazines profitably, but he can make money selling subscriptions to them online. As books, magazines, music and movies are delivered to consumers in a myriad of new digital ways, no one, perhaps, is grappling more with determining how to bridge the revenue gap than the CEO of the company that distributes entertainment media to every Walmart and Sam's Club in the United States and Canada, as well as Army and Air Force bases around the world.
>
> Change doesn't come easy. . . .

5

And he's feeling the pinch.

CD sales are declining rapidly as more listeners download single songs onto iPods, smartphones and to their computers, more often than not for free. The loss of revenue is being felt by nearly everyone connected to the industry, even popular artists whose recession-weary fans aren't buying as many concert tickets either.

The stakes are higher than just the survival of his own business, Anderson warns.

"The rate of decline of physical music is happening so much quicker than the rate of increase in digital music that if the trend doesn't change within three years the entire music industry could go away," says Anderson, whose many business interests include Liquid Digital Media, which serves as Walmart's e-commerce music site.

That's why Anderson, described nearly universally as quiet and unassuming, broke what he says was a 17-year media silence this summer by doing an interview with Billboard magazine to outline five steps he believes the industry should take to extend the life of the CD.

His suggestions, he says, are meant to create a conversation. "Whoever you talk to in the music business today, they will all say, 'We don't have the answer. We are looking for new revenue streams and new ways to do business, and we also recognize the model we have today is headed in the wrong direction,'" he says. . . .

Anderson says he doesn't know how many companies the family owns currently, but estimates they've bought, sold and kept at least 150. . . .

Charlie Anderson knows what he can't do -- compete with Steve Jobs and Jeff Bezos. Both men have driven down the cost of content, whether music or books, in order to sell iPods and Kindles.

The DVD and book business is likely to follow magazines and music -- Anderson Merchandisers will snap up ailing competitors, have some really good years and then?

"We are very good at what we call 'pick, pack and delivery,' and we think we are excellent at what we call the last 100 feet -- from the retailers' back room to actually getting the program executed within the store," Anderson says. "Thirdly, we think we are very good at

LEGAL\55686759\2 00601.0823.000/390810.000

putting a consumer product program together and knowing how you can execute that at a retailer like Walmart."

"So we may evolve into a company that is less a pick, pack and delivery company and more of an in-store execution company. We are doing programs like that as we speak."

22. The evolution described by Defendant Anderson involved the eventual segregation and sale of Anderson Media's physical media distribution entity ANConnect, with the sale proceeds funneled up to other Anderson Media entities, leaving ANConnect an empty shell with no ability to pay its creditors.

23. The process began in earnest in September 2012, when Anderson Merchandisers, LP (the entity responsible for physical media distribution) was converted into Anderson Merchandisers, LLC, with Anderson Media Corporation as its sole member.

24. On April 29, 2013, Anderson Merchandisers, LLC changed its name to Anconnect, LLC.[1]

**Anderson Media Offloads ANConnect's Failing Video Assets To Alchemy**

25. In his May 12, 2014 notes, Defendant Lardie wrote that it "appears the only profitable account for ANConnect is Walmart," that he estimated it would take at least three years to recoup ANConnect's losses from Dreamworks' contract shortfall, and that ANConnect should "stop chasing movie content" because this aspect of its business causes "time and resources [to be] wasted."

26. By December 2014, Anderson Media's top priority was to "[c]ut ANconnect expenses ASAP . . . [b]ecause of soft sales trends and higher expenses than expected."

---

[1] ANConnect is referred to in the record with varying forms of capitalization (e.g., ANConnect, Anconnect, ANconnect, ANCONNECT). While the April 29, 2013 Certificate of Amendment filed with the Texas Secretary of State uses "Anconnect," "ANConnect" is the most frequently used and is accordingly used elsewhere herein.

27. An integral part of Anderson Media's plan to "cut ANconnect expenses ASAP" was to offload its rapidly dying video business to Alchemy for an amount that far exceeded the business's true value.

28. In a Term Sheet dated February 11, 2015, Millennium Entertainment, LLC (now known as Alchemy) expressed the intent to purchase ANConnect's "US video and digital distribution business" and to assume "certain specified liabilities and obligations" of ANConnect, in exchange for "a multiple of 4 times estimated Proforma EBITDA of the Physical Business and 6 times estimated Proforma EBITDA of the Digital Business."

29. ANConnect and Alchemy executed an Asset Purchase Agreement dated May 7, 2015 (the "APA"). The APA defines the "Business" purchased by Alchemy as ANConnect's "home video and digital distribution for motion pictures and other audiovisual media in and throughout the United States of America and its territories and protectorates, excluding, for clarity, music, including music videos, and any in-store merchandising services performed by Anderson Merchandisers, LLC."

30. The APA sets forth an aggregate purchase price for the Purchased Assets of $37,637,347, consisting of (a) $35,893,147 allocated to the physical segment of the Business, and (b) $1,744,200 for ANConnect's 51% membership interest in Anderson Digital.

31. Alchemy also agreed to assume certain liabilities of ANConnect, including, inter alia: (i) liabilities related to content suppliers' contracts, inventory sales, and personnel; (ii) amounts due to content owners; and (iii) accounts payable to wholesale suppliers.

32. Closing on the ANConnect Transaction occurred on July 9, 2015 (the "Closing").

33. The cash payments made by Alchemy in connection with the Closing totaled $29,888,124.40, and the liabilities assumed by Alchemy exceeded $16 million.

34. As alleged in detail by the Trustee in the pending litigation captioned *Miller v. ANConnect, LLC, et al.*, Bankr. D. Del. Adv. Pro. No. 18-50633-JTD (the "Avoidance Action"), the ANConnect Transaction is avoidable as a constructive and actual fraudulent transfer.

35. ANConnect knew that Alchemy failed to receive reasonably equivalent value in the ANConnect transaction, as it internally described the business as "immediately and forever upside down."

36. The Avoidance Action seeks damages from ANConnect and others in excess of $50 million.

### **Anderson Media Offloads ANConnect's Remaining Lines of Business**

37. On April 29, 2016, ANConnect announced that it had sold its retail book distribution business to Readerlink Distribution Services, LLC. As with the sale of ANConnect's video assets to Alchemy, physical book merchandising services for stores previously supplied by ANConnect were to continue to be provided by Anderson Merchandisers. In the aftermath of the sale, ANConnect announced that it was laying off 172 of its 230 Amarillo, Texas-based employees.

38. On July 8, 2016, ANConnect announced that it had sold its retail music assets and business to Alliance Entertainment Holding Corporation. The deal was described by Billboard as "a move that will send shockwaves through what's left of the U.S. physical-music sector." As with the sale of ANConnect's video and book assets, physical product merchandising services for stores previously supplied by ANConnect were to continue to be provided by Anderson Merchandisers.

### **Alchemy Asserts Counterclaims Against ANConnect**

39. On February 17, 2016, ANConnect and Anderson Merchandisers filed a complaint against Alchemy in the Superior Court of Delaware (the "Delaware State Court Action"), alleging

that Alchemy owed them for post-closing adjustments and certain other payments under the APA, as well as compensation for various transition and merchandising services.

40. ANConnect's Complaint admits that it collected receivables on Alchemy's behalf yet failed to remit those collections to Alchemy based on a so-called "equitable setoff" that does not exist.

41. In this regard, ANConnect conceded: "[u]nder the Transition Services Agreement, ANConnect has collected receivables from Walmart/Sam's Club, Best Buy, and Ingram on behalf of Alchemy," but "has withheld $6,047,325 [of those receivables] as an equitable setoff" for amounts allegedly owed to ANConnect under the APA and other ancillary agreements.

42. ANConnect's improper withholding of in excess of $6,047,325.00 in violation of Section 2.06(b)(iv) of the APA and Exhibit B to the Transition Services Agreement resulted in a decrease in working capital, service disruption with key vendors, a decay in relations with content partners, and delivery snafus with Alchemy's key retail partners.

43. Due to ANConnect's wrongful withholding of receivables, Alchemy was required to use third-party financing otherwise budgeted for funding growth initiatives (including ongoing film acquisition investments).

44. On April 11, 2016, Alchemy filed an Answer, Affirmative Defenses, and Counterclaims in the Delaware State Court Action, denying liability and asserting counterclaims (the "Counterclaims") against ANConnect for breach of the APA and ancillary documents, including a claim for ANConnect's wrongful withholding of more than $6 million in receivables which ANConnect admitted it owed.

45. On May 11, 2016, ANConnect filed an Answer and Affirmative Defenses to Alchemy's Counterclaims in which it again admitted to having withheld more than $6 million on account of receivables collected by ANConnect for Alchemy's benefit.

46. Discovery obtained by the Trustee in the Avoidance Action establishes that ANConnect actually withheld in excess of $8 million of receivables due to Alchemy.

47. Alchemy is accordingly a creditor of ANConnect for purposes of the Delaware Uniform Fraudulent Transfer Act, which defines a "creditor" as "a person who has a claim" and a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

48. Alchemy is also a creditor of ANConnect by virtue of asserting claims against it in the Avoidance Action.

**ANConnect Funnels Money To Affiliates To Frustrate Payment On Alchemy's Claims**

49. In June 2016, while ANConnect was liquidating its assets and winding down operations and just months after creditor Alchemy asserted the Counterclaims, ANConnect transferred $10 million to Anderson Media as an equity distribution (the "June 2016 AM Transfer").

50. ANConnect also transferred $1,096,320 to AMS in June 2016 (the "June 2016 AMS Transfer").

51. In August 2016, ANConnect transferred an additional $5 million to Anderson Media as an equity distribution (the "August 2016 Transfer").

52. In an internal analysis emailed on December 13, 2016 from Defendant Taylor to Defendant Maier and others, ANConnect reports having made a total of $23.8 million in equity

11

distributions to Anderson Media in the wake of the sales of its video, music, and book businesses—thereby establishing that it transferred an additional $8.8 million to Anderson Media (the "Additional Transfer") over and above the June and August 2016 transfers. The Additional Transfer, the June 2016 AM Transfer, the June 2016 AMS Transfer and the August 2016 Transfer are collectively referred to herein as the "Fraudulent Transfers."

53. The Fraudulent Transfers were conceived and executed by the Director/Officer Defendants for the benefit of Anderson Media and AMS, and their shareholders, including the Director/Officer Defendants themselves.

54. At the time ANConnect made the Fraudulent Transfers, Alchemy was a creditor of ANConnect and had asserted claims against it in the Delaware State Court Action.

55. ANConnect made the Fraudulent Transfers with actual knowledge of Alchemy's creditor status and claims against it and, upon information and belief, made the Fraudulent Transfers with the intent to hinder, delay, or defraud Alchemy and prevent it from recovering on both the already asserted counterclaims and claims which it expected Alchemy to raise in the future.

56. Upon information and belief, ANConnect made the Fraudulent Transfers without making an appropriate reserve to account for Alchemy's claims.

57. ANConnect received no value for the Fraudulent Transfers because they represent payments made on account of equity interests.

58. At the time ANConnect made the Fraudulent Transfers, it was insolvent and inadequately capitalized. Alternatively, ANConnect was rendered insolvent and inadequately capitalized by the Fraudulent Transfers.

LEGAL\55686759\2 00601.0823.000/390810.000

59. The Fraudulent Transfers—made in connection with Defendants' wind-down of ANConnect's operations—rendered ANConnect an empty shell with no assets to satisfy creditor claims including those of Alchemy.

60. An internal ANConnect balance sheet as of September 30, 2016 reports that ANConnect's liabilities exceeded its assets by $7.2 million. When the improper $8 million setoff of receivables due Alchemy is reversed, ANConnect's admitted liabilities exceeded its assets by more than $15 million.

61. The Fraudulent Transfers were made in connection with ANConnect's liquidation of its business.

62. ANConnect reported substantial operating losses and negative EBITDA from 2014-2016, including a net loss of $4.37 million for its fiscal year ending October 3, 2014, and negative rolling twelve-month EBITDA of $9.6 million as of 10/31/14, $16.9 million as of 1/30/15, and $7.8 million as of 5/29/15.

63. ANConnect concealed the Fraudulent Transfers from its creditors.

64. Anderson Media and ANConnect are privately held businesses with nonpublic finances.

65. The Fraudulent Transfers were not disclosed to and were concealed from ANConnect's creditors, and the Trustee did not discover, and could not have discovered, the existence of the Fraudulent Transfers until ANConnect made a document production in the Avoidance Action in March 2021, which, for the first time, disclosed the Fraudulent Transfers.

## V. THE CLAIMS

### FIRST CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
**Pursuant to 6 Del. C. § 1304(a), and 11 U.S.C. §§ 544 and 550**
**(Against ANConnect, Anderson Media, and AMS)**

66. Paragraphs 1 through 65, above, are incorporated herein by reference, as if restated in their entirety.

67. The Trustee seeks to avoid the Fraudulent Transfers and recover the value of each from any initial, immediate, and/or mediate transferees.

68. Each Fraudulent Transfer was a "transfer" within the definition of 6 Del. C. § 1301.

69. This action has been brought within one (1) year after the Fraudulent Transfers were (or could reasonably have been) discovered by the Trustee.

70. Alchemy was a creditor of ANConnect at the time the Fraudulent Transfers occurred.

71. ANConnect made the Fraudulent Transfers with the actual intent to hinder, delay, and/or defraud its then-current and future creditors, including Alchemy.

72. The Fraudulent Transfers were made to Anderson Media and AMS, insiders of ANConnect.

73. The Fraudulent Transfers were not disclosed to creditors of ANConnect.

74. ANConnect received no value in exchange for the Fraudulent Transfers.

75. Upon information and belief, the Fraudulent Transfers consisted of substantially all the assets of ANConnect and rendered ANConnect insolvent.

76. The Fraudulent Transfers were made by ANConnect after Alchemy had commenced suit to recover monies owed to it.

77. Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to Delaware law.

## SECOND CLAIM – BREACH OF FIDUCIARY DUTY/TRUST FUND DOCTRINE
**(Against the Director/Officer Defendants)**

78. Paragraphs 1 through 77, above, are incorporated herein by reference, as if restated in their entirety.

79. Due to ANConnect's insolvency and cessation of active business operations, ANConnect's assets became a trust fund for the benefit of its creditors, with ANConnect's officers and directors, and the officers and directors of its parent companies, holding its corporate assets in trust for creditors, to whom a fiduciary duty is owed.

80. As controlling shareholders, directors, and/or officers of Anderson Media, ANConnect, and/or AMS, the Director/Officer Defendants, through the misconduct and knowledge described above regarding the Fraudulent Transfers, breached the fiduciary duties owed to ANConnect's creditors, including Alchemy.

81. The Director/Officer Defendants' conduct cannot be attributed to any rational business purpose for the benefit of ANConnect or its creditors, and they knew or recklessly disregarded the fact that they were acting in a manner that was adverse to the interests of ANConnect and its unsecured creditors, including Alchemy.

82. As a result of these breaches of fiduciary duty, ANConnect's unsecured creditors, including Alchemy, have been damaged.

83. Specifically, the Director/Officer Defendants breached their fiduciary duties to ANConnect's creditors (including Alchemy), while ANConnect was insolvent or operating in the zone of insolvency, by failing to protect the existing corporate assets for the benefit of creditors, by effectuating the Fraudulent Transfers for the benefit of the parents of ANConnect and the

shareholders thereof without regard to the interests of ANConnect's creditors, and by failing to prevent the Fraudulent Transfers.

84. The Director/Officer Defendants placed the interests of Anderson Media and themselves over those of ANConnect and its creditors, including Alchemy.

85. As a result of the breaches of fiduciary duty described above, Alchemy has suffered damages in an amount to be determined at trial.

### THIRD CLAIM – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against the Director/Officer Defendants)

86. Paragraphs 1 through 85, above, are incorporated herein by reference, as if restated in their entirety.

87. To the extent that any of the Director/Officer Defendants might be found not to have had a fiduciary duty to Alchemy at the time of the transactions complained of herein, each such Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other defendants possessing such duties at the relevant times.

88. As described in the paragraphs above, each non-fiduciary defendant substantially assisted, knowingly participated in, benefitted from, and aided and abetted the breaches of fiduciary duties engaged in by the other defendants.

## VI.  RELIEF REQUESTED

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of Our Alchemy, LLC and Anderson Digital, LLC, demands judgment in his favor and against the Defendants:

(a) For avoidance and recovery of the Fraudulent Transfers;

(b) Directing the Defendants to immediately pay the Trustee the amount of the Fraudulent Transfers necessary to satisfy Alchemy's claims against it, plus interest thereon and

16

costs, and in connection therewith, enter judgment in favor of the Trustee and against the Defendants;

(c) Against the Director/Officer Defendants, jointly and severally, for damages in an amount to be determined at trial;

(d) Pre-Judgment and Post-Judgment Interest, reasonable attorneys' fees, and costs; and

(e) Such additional relief as this Court deems just.

## VII. <u>JURY DEMAND</u>

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

Dated: December 29, 2021

/s/ *John T. Carroll, III*
_____

John T. Carroll, III (DE No. 4060)
COZEN O'CONNOR
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
Fax: (302) 295-2013
jcarroll@cozen.com

and

Steven M. Coren (Admitted *pro hac vice*)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com

*Counsel for Plaintiff*
*George L. Miller, Ch. 7 Trustee*