## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| OUR ALCHEMY, LLC, *et al.*,[1] | Case No. 16-11596-JTD |
| *Debtors.* | Jointly Administered |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC, | Adv. Pro. No. 21-51420-JTD |
| *Plaintiff,*<br>v. | |
| ANDERSON MEDIA CORPORATION, *et al.*, | **Re: Adv. D.I. 40** |
| *Defendants.* | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COREN & RESS, P.C.**
Steven M. Coren, Esq. *(pro hac vice)*
Andrew J. Belli, Esq. *(pro hac vice)*
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170

Dated: July 31, 2023

**COZEN O'CONNOR**
John T. Carroll, III (DE Bar No. 4060)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
Fax: (302) 295-2013

*Attorneys for Plaintiff*
*George L. Miller, Ch. 7 Trustee*

---

[1] The Debtors are: Our Alchemy, LLC, Case No. 16-11596 and Anderson Digital, LLC, Case No. 16-11597.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

I.   COUNTERSTATEMENT OF MATERIAL FACTS ............................................1

    A.   Anderson Media Offloads ANConnect's Failing Video Assets to Alchemy ...................2

    B.   Alchemy Asserts Counterclaims Against ANConnect in Delaware State Court..............2

    C.   ANConnect Funnels Money to Affiliates to Frustrate Payment on Alchemy's
Claims.....................................................................................................................3

    D.   Discovery in the Companion Adversary Reveals the Extent of the Fraudulent
Transfers .................................................................................................................7

II.  SUMMARY JUDGMENT STANDARD ..............................................................8

III. ARGUMENT.......................................................................................................9

    A.   The Court Need Not Engage in a Choice of Law Analysis Because Delaware and
Texas Have Both Adopted the UFTA, and Defendants' Motion Should Be Denied
Under Either State's Law ........................................................................................9

    B.   Defendants are Not Entitled to Summary Judgment on the Trustee's Actual
Fraudulent Transfer Claims ..................................................................................10

        1.   Debtor Alchemy Was a Creditor of ANConnect ..........................................11

        2.   There is Evidence Supporting the Existence of at Least *Nine* Badges of Fraud
Demonstrating Actual Fraudulent Intent .....................................................13

            a.   The Transfers Were Made to Insiders of ANConnect – Badge (b)(1)..................15

            b.   ANConnect Effectively Retained Control of the Property Transferred,
Because Defendants Operate as a Consolidated Enterprise – Badge (b)(2)........16

            c.   The Transfers Were Concealed and Constituted the Removal of ANConnect's
Assets – Badges (b)(3) and (b)(7) .......................................................17

            d.   The Transfers Were Made in the Months Following Alchemy Filing
Substantial Counterclaims Against ANConnect – Badges (b)(4) and (b)(10) ....19

            e.   The Transfers Consisted of Substantially all of ANConnect's Assets –
Badge (b)(5)........................................................................................20

            f.   The Transfers Rendered ANConnect Insolvent – Badge (b)(9)..........................20

i

g.   The Transfers Were Made for no or Insufficient Consideration –
Badge (b)(8)..........................................................................................................20

3.   Defendants Have Not Proven a Legitimate Supervening Purpose for the
Transfers .............................................................................................................23

C.   There is a Genuine Dispute of Material Fact Regarding When the Transfers Could
Have Reasonably Been Discovered by the Trustee........................................................24

1.   Testimony Concerning Statements Made in the September 13, 2018 Settlement
Meeting do Not Establish That the Trustee's Claims are Untimely ..........................25

a.   The Statements Constitute Inadmissible Settlement Communications ...............25

b.   There Are Genuine Disputes of Material Fact Concerning Defendants'
Disclosures During That Meeting, Which Were Insufficient To Either
Establish Or Put the Trustee On Notice of any Potential Fraudulent Transfer
Claim .............................................................................................................26

2.   The Transfers Could Not Have Been Reasonably Discovered Prior to
ANConnect's March 2021 Document Production Revealing Them ..........................28

IV.   CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 F. App'x 924 (Fed. Cir. 2005) .......................... 17

*ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) ................................ 13

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585 (5th Cir. 2020).......................... 24, 30

*Behlau v. Tiger Tiger Prods., LLC*, 2021 WL 981672 (D.N.H. Mar. 16, 2021),
   *reconsideration denied*, 2021 WL 1550459 (Apr. 20, 2021) .................................................. 25

*Flores v. Robinson Roofing & Const. Co.*, 161 S.W.3d 750 (Tex. App. 2005).......................... 14

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) ........................................................ 9

*In re Am. LaFrance, LLC*, 461 B.R. 267 (Bankr. D. Del. 2011) ................................................... 9

*In re Brentwood Lexwood Partners, LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003) .................... 21

*In re David Cutler Indus., Ltd.*, 502 B.R. 58 (Bankr. E.D. Pa. 2013) ........................................ 21

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017)............................................ 10

*In re Maxus Energy Corp.*, 615 B.R. 62 (Bankr. D. Del. 2020) .................................................... 8

*In re Maxus Energy Corp.*, 641 B.R. 467 (Bankr. D. Del. 2022).......................................... *passim*

*In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr. D. Del. 2010) ..................................... 9, 10

*In re Our Alchemy, LLC*, 2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) .......................... 15

*In re PennySaver USA Publ'g, LLC*, 602 B.R. 256 (Bankr. D. Del. 2019) ................................ 28

*In re Ritz*, 567 B.R. 715 (Bankr. S.D. Tex. 2017)............................................................... *passim*

*In re Roti*, 271 B.R. 281 (Bankr. N.D. Ill. 2002) ....................................................................... 17

*In re SemCrude, L.P.*, 2013 WL 2490179 (Bankr. D. Del. June 10, 2013)................................ 21

*In re Soza*, 542 F.3d 1060 (5th Cir. 2008) ................................................................................. 15

*In re The Heritage Org., L.L.C.*, 413 B.R. 438 (Bankr. N.D. Tex. 2009) .................................. 24

*In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011) ............................................................. 14

*In re Vaso Active Pharms., Inc.*, 2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) ............. *passim*

*In re Zohar III, Corp.*, 631 B.R. 133 (Bankr. D. Del. 2021) ...................................................... 28

*Janvey v. Romero*, 817 F.3d 184 (5th Cir. 2016)........................................................................ 25

*Jones v. Dyna Drill Techs., LLC*, 2018 WL 4016413 (Tex. App. Aug. 23, 2018)...................... 13

*JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211 (Del. Ch. 2019) .................................. 24

*Kelly v. Armstrong*, 141 F.3d 799 (8th Cir. 1998) ...................................................................... 24

*Nelmark v. Helms*, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003)................................................ 17

*State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301 (E.D. Pa. 2011)...................... 29

*Williams v. Performance Diesel, Inc.*, 2002 WL 596414 (Tex. App. Apr. 18, 2002) .................. 12

*Zas v. Canada Dry Bottling Co. of New York, L.P.*, 2013 WL 3285143
    (D.N.J. June 27, 2013) ....................................................................................................... 25

*Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311 (Tex. Ct. App. 2012) .............. 30

## Rules and Statutes

6 Del. C. § 1301 ..................................................................................................................... *passim*

6 Del. C. § 1302 ............................................................................................................................ 20

6 Del. C. § 1303 ............................................................................................................................ 21

6 Del. C. § 1304 ..................................................................................................................... *passim*

6 Del. C. § 1309 ............................................................................................................................ 24

11 U.S.C. § 548 ............................................................................................................................ 21

Federal Rule of Evidence 408 ...................................................................................................... 25

Tex. Bus. & Com. Code § 24.002 ........................................................................................ *passim*

Tex. Bus. & Com. Code § 24.005 ........................................................................................ *passim*

Tex. Bus. & Com. Code Ann. § 24.003 ........................................................................................ 20

Tex. Bus. & Com. Code Ann. § 24.004 ........................................................................................ 21

Tex. Bus. & Com. Code Ann. § 24.010 ........................................................................................ 24

## Other Authorities

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................................................... 21

Restatement (Second) of Conflict of Laws § 145 ....................................................................... 10

Plaintiff George L. Miller, Chapter 7 Trustee ("Plaintiff" or the "Trustee") for the jointly administered bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC ("Anderson Digital" and, together with Alchemy, the "Debtors")[2], submits this Memorandum of Law in opposition to the *Motion for Summary Judgment* (Adv. D.I. 40) (the "Motion") filed by Defendants Anderson Media Corporation ("Anderson Media"), ANConnect, LLC ("ANConnect"), and Anderson Management Services, Inc. ("AMS") (collectively, the "Defendants"). For the reasons set forth herein, the Motion is without merit and should be denied.

## I.    COUNTERSTATEMENT OF MATERIAL FACTS

Defendant Anderson Media is a closely held Delaware corporation which functions as the holding company for a group of companies which includes Defendants ANConnect and AMS. *See* Defendants' Answer (Adv. D.I. 28), at ¶ 8. ANConnect and AMS are wholly owned by Anderson Media, and AMS is the sole Manager of ANConnect. *See id.* at ¶¶ 9-10. ANConnect is a Texas limited liability company, and AMS is a Tennessee corporation. *See id.* at ¶¶ 8-10. Anderson Media operates as an integrated unit with its subsidiaries, issues consolidated balance sheets which include its subsidiaries, and conducts board meetings at which the Anderson Media board of directors makes decisions concerning the operation of subsidiaries. *See, e.g.,* Ex.[3] A (3/11/2016 Anderson Media Board of Directors Meeting Minutes including a "management report" at which the board discussed its decision to sell ANConnect's book and music businesses, and attaching consolidated financials for the Anderson Media enterprise).

---

[2]     Debtors Alchemy and Anderson Digital are Delaware limited liability companies. *See* Bankr. No. 16-11596, D.I. 1; Bankr. No. 16-11597, D.I. 1.

[3]     Citations herein to "Ex. __" refer to exhibits attached to the Declaration of Steven M. Coren ("Coren Dec."), which has been submitted contemporaneously herewith in support of the Trustee's Opposition to Defendants' Motion.

### A.    Anderson Media Offloads ANConnect's Failing Video Assets to Alchemy

In his May 12, 2014 notes, Bill Lardie (Chief Executive of ANConnect) wrote that it "[a]ppears the only profitable account for ANconnect is Walmart," that he estimated it would take at least three years to recoup ANConnect's losses from a contract shortfall with Dreamworks, and that ANConnect should "stop chasing movie content" because this aspect of its business causes "time and resources [to be] wasted."  Ex. B at ¶¶ 7-8.  By December 2014, Anderson Media's top priority was to "[c]ut ANconnect expenses ASAP . . . [b]ecause of soft sales trends and higher expenses than expected."  Ex. C at ¶ 2.  An integral part of Anderson Media's plan to "cut ANconnect expenses ASAP," *id.*, was to offload its rapidly dying video business.  Ex. D (email discussing rationale for sale of ANConnect's video business).

In July 2015, pursuant to an Asset Purchase Agreement dated May 7, 2015 ("APA"), Debtor Alchemy purchased certain physical home video and digital distribution capabilities from Defendant ANConnect, including, *inter alia*, the purchase of Debtor Anderson Digital (the "ANConnect Transaction").  Ex. E ("APA").  The cash payments made by Alchemy to ANConnect in connection with the transaction's closing totaled $29,888,124.40.  Ex. F.  ANConnect knew that Alchemy failed to receive reasonably equivalent value in the ANConnect Transaction, as it internally described the business as "immediately and forever upside down."  Ex. G.

### B.    Alchemy Asserts Counterclaims Against ANConnect in Delaware State Court

On February 17, 2016, ANConnect and Anderson Merchandisers sued Alchemy in the Superior Court of Delaware (the "Delaware State Court Action"), alleging that Alchemy owed them for post-closing adjustments and certain other payments under the APA, as well as compensation for various services under a Transition Services Agreement ("TSA") between Alchemy and ANConnect.  *See* Ex. H (Delaware State Court Action Complaint); Ex. I (TSA).

2

ANConnect's Complaint admits that it collected over six million dollars' worth of receivables on Alchemy's behalf yet failed to remit those collections to Alchemy based on a so-called "equitable setoff" (which does not exist). *See* Ex. H at ¶ 67; *see also id.* at ¶ 68 ("ANConnect seeks to retain the $6,047,325.00 . . . as an equitable setoff"). ANConnect's improper withholding of these receivables violates Section 2.06(b)(iv) of the APA and Exhibit B to the TSA. *See* Ex. E (APA), at § 2.06(b)(iv); Ex. I (TSA), at Ex. B.

On April 11, 2016, Alchemy filed an Answer with Affirmative Defenses and Counterclaims in the Delaware State Court Action, denying liability and asserting Counterclaims against ANConnect for breach of the APA and ancillary documents, including a claim for ANConnect's wrongful withholding of more than $6 million in receivables which ANConnect admitted it owed. *See* Ex. J, at pp. 46-63. On May 11, 2016, ANConnect filed an Answer and Affirmative Defenses to Alchemy's Counterclaims in which it again admitted to having withheld more than $6 million on account of receivables collected by ANConnect for Alchemy's benefit. *See* Ex. K, at ¶ 21; *see also* Ex. L, Maier Dep. at 24:2-17 (ANConnect designee admits that ANConnect failed to remit over $6,047,325 of Alchemy's receivables).

### C. ANConnect Funnels Money to Affiliates to Frustrate Payment on Alchemy's Claims

<u>June 2016 AM Transfer</u>

In June 2016, while ANConnect was liquidating its assets and winding down operations and just 2 months after Alchemy asserted the Counterclaims, ANConnect transferred $10 million to Anderson Media as an equity distribution (the "June 2016 AM Transfer"). *See* Ex. M (August 5, 2016 email from Boris Popov, Director of Internal Audit, to Anderson Media CFO Jay Maier and ANConnect CFO/COO Chuck Taylor, attaching "Cash Flow Analysis" for ANConnect, with

section entitled "Cash Flow to Parent" confirming a "Distribution to Media (completed in June)" in the amount of $10,000,000).

Defendants cite no contemporaneous books, records, or other evidence to support the assertions in the Maier Declaration (Adv. D.I. 41-1, ¶ 21) that the June 2016 AM Transfer was made to AMS (rather than Anderson Media) to pay "outstanding advisory fees" and "eliminate a Tennessee state tax loss carryforward," or that it was "properly recorded in ANC[onnect] and [AMS's] books and records."[4]    Contrary to Defendants' post-hoc assertions, the contemporaneously-prepared cash flow analysis, which was sent to Mr. Maier, characterizes the payment as a "Distribution" that was made to "Media" (*i.e.*, Anderson Media).  *See* Ex. M, at ANConnect-OurAlch0032102; *see also* Ex. N (spreadsheet indicating that Anderson Media received a "Special payment" of $10 million in June 2016).

June 2016 AMS Transfer

ANConnect also transferred $1,096,320 to AMS in June 2016 (the "June 2016 AMS Transfer").  *See* Defendants' Answer (Adv. D.I. 28), at ¶ 50 ("Defendants admit that [ANConnect] transferred $1,096,320 to AMS in June 2016.").  As established by an internal ANConnect income statement as of September 30, 2016, ANConnect's characterization of payments to related entities

---

[4] The only book/record Defendants submitted with their motion is an Anderson Media general ledger page concerning payments purportedly made to pay down a Bank of America loan.  *See* Adv. D.I. 41-1, Maier Decl. at Ex. 6 and ¶ 17.  According to Defendants (and as the evidence shows), the payments and related 5/31/2016 and 6/10/2016 transfers from ANConnect shown in the general ledger are different from the Transfers that are the subject of the Trustee's fraudulent transfer claims.  Rather than showing any legitimate purpose for the Transfers at issue in this case, the general ledger report merely demonstrates that the transfers challenged by the Trustee were only a portion of the tens of millions of dollars ANConnect funneled to Anderson Media during mid-2016.  Additionally, the general ledger report, which indicates it was created November 10, 2022, does not reflect the June 2016 AM Transfer, August 2016 Transfer, or the Additional Transfer to Anderson Media and thus cannot as a matter of law serve as a compelling basis to grant Defendants' Motion, given that (as discussed *infra*) it conflicts with contemporaneous documents which were prepared by ANConnect and sent to Maier.

4

as management fees was a sham, as the statement indicates that management fees for just three quarters of 2016 – a year in which ANConnect was winding down its operations – had increased by $15 million from the prior year without justification. *See* Ex. O at n. 1.

August 2016 Transfer

In August 2016, ANConnect transferred an additional $5 million to Anderson Media as an equity distribution (the "August 2016 Transfer"). *See* Ex. P (September 28, 2016 email from Popov to Maier with attachment confirming that a "P[a]yment to Anderson Media" in the amount of $5,000,000 was "Paid in August"). Defendants cite no contemporaneous books, records, or other evidence to support the assertions in the Maier Declaration (Adv. D.I. 41-1, ¶ 21) that the August 2016 Transfer was made to AMS (rather than Anderson Media) to pay "outstanding advisory fees" and "eliminate a Tennessee state tax loss carryforward," or that it was "properly recorded in ANC[onnect] and [AMS's] books and records." Contrary to these post-hoc assertions, the contemporaneously-prepared liquidation value estimate, which was sent to Mr. Maier, characterizes the payment as one made "to Anderson Media." Ex. P.

Additional Transfer

On December 13, 2016, Chuck Taylor (ANConnect's CFO/COO) emailed an internal analysis "for Board discussion" to Mr. Maier and others. *See* Ex. Q (December 13, 2016 email attaching "Analysis for Board discussion 12.13.16.xlsx"). The analysis states that ANConnect had made a total of $23.8 million in transfers to Anderson Media in the wake of the sales of its video, music, and book businesses. *See* Ex Q (attachment). These transfers are characterized in the analysis as "Payments to parent"—*i.e.*, to Anderson Media, ANConnect's parent company. *Id.* This establishes that ANConnect transferred an additional $8.8 million to Anderson Media (the "Additional Transfer") over and above the June 2016 AM Transfer and the August 2016 Transfer

5

(which together, had totaled $15 million).  The almost $24 million that was transferred and the fact that the transfers constituted distributions – and not legitimate payments for services – is firmly established by numerous ANConnect internal documents.  *See* Ex. M at ANConnect-OurAlch0032102 (stating that ANConnect intended to upstream $23.6 million to Anderson Media "net of loan repayment"); Ex. N (anticipating that ANConnect would make "[s]pecial payment[s]" totaling $23.5 million to Anderson Media from June 2016-February 2017).

 Defendants cite no contemporaneous books, records, or other evidence to support the assertions in the Maier Declaration (Adv. D.I. 41-1, ¶ 23) that the $8.8 million was actually transferred to AMS (not Anderson Media) for "ordinary course monthly management and flight department costs," or that it was "properly recorded in ANC[onnect] and [AMS's] books and records."  The contemporaneously-prepared analysis from ANConnect's CFO/COO, which was sent to Mr. Maier and intended for the Board, flatly contradicts these assertions.  *See* Ex. Q.

The June 2016 AM Transfer, June 2016 AMS Transfer, August 2016 Transfer, and Additional Transfer are referred to herein, collectively, as the "Transfers."  While Defendants dispute (without evidentiary support) the purpose of the Transfers  (the bulk of which are described as equity distributions in contemporaneous internal communications) and whether certain of them were made to Anderson Media or AMS, they do *not* dispute that ANConnect made the Transfers in the amounts indicated.

When the Transfers were made, ANConnect was liquidating all of its business lines.  *See, e.g.,* Ex M at ANConnect-OurAlch0032100 (noting that ANConnect sold its book business effective 4/29/16 and sold its music and internet business effective 7/8/16).  ANConnect reported substantial operating losses and negative EBITDA from 2014-2016, including a net loss of $4.37 million for its fiscal year ending October 3, 2014, and negative rolling twelve-month EBITDA of

$16.9 million as of 1/30/15 and $7.8 million as of 5/29/15.  *See* Ex. R, at p. 3 (Combined Financial

Report showing $4.37 million loss for year ended 10/3/2014); Ex. S (listing a negative $16,897,992

EBITDA for the ANConnect business unit for the 12 months ended 1/30/15); Ex. T (listing a

negative $7,816,116 EBITDA for the ANConnect business unit for the 12 months ended 5/29/15).

ANConnect's internal balance sheet as of September 30, 2016—after all of its business lines had

been sold—reflects that ANConnect was insolvent because its liabilities exceeded its assets by

$7.2 million, even without considering the $8 million in improperly-withheld receivables due to

Alchemy pursuant to the Counterclaims.  *See* Ex. U (December 8, 2016 email from Taylor to Maier

and another individual, attaching "detailed trial balance as of September 30, 2016" which indicates

assets totaling $12,972,382.12 and liabilities totaling $20,175,350.55).   Anderson Media and

ANConnect are privately held companies with non-public finances.  *See* Defendants' Answer

(Adv. D.I. 28), at ¶¶ 8, 64.

> **D.** **Discovery in the Companion Adversary Reveals the Extent of the Fraudulent Transfers**

Alchemy and Anderson Digital filed for Chapter 7 bankruptcy on July 1, 2016 (the

"Petition Date").  *See* Bankr. Nos. 16-11596 and 16-11597 at D.I. 1.  On June 29, 2018, the Trustee

commenced a related adversary proceeding against defendants that include ANConnect, captioned

*Miller v. ANConnect, LLC, et al.*, Adv. No. 18-50633 (the "Companion Adversary"), seeking to,

*inter alia*, avoid the ANConnect Transaction as a constructive and actual fraudulent transfer.  *See*

Companion Adversary, Adv. No. 18-50633 at D.I. 1 (Complaint), D.I. 84 (Memorandum Opinion,

denying in part and granting in part ANConnect's motion to dismiss).  The Companion Adversary

seeks damages from ANConnect and others in excess of $50 million.

In March 2021, when ANConnect made its document production in the Companion

Adversary, the Trustee and undersigned counsel first discovered that ANConnect had upstreamed,

via the Transfers, nearly $24 million to its related entities. *See* Coren Decl. at ¶ 10; Ex. V, Miller Dep. at 19:6-20:7 (Trustee testifies that he did not discover the amount upstreamed by ANConnect until "discovery [in the Companion Adversary] started, and then we found that in discovery."); Ex. W, Homony Dep. at 82:10-13; Ex. X (3/25/21 letter from ANConnect attorney conveying "ANConnect's first production"); Exs. M and Q (documents produced by ANConnect on 3/25/21 as part of its first production that for the first time disclosed to the Trustee the existence and magnitude of the transfers at issue).

The Trustee commenced this adversary on December 29, 2021. *See* Adv. D.I. 1. On June 27, 2022, the Court denied Defendants' motion to dismiss the Trustee's actual fraudulent transfer claims. *See* Adv. D.I. 20. During discovery in the instant adversary, the Trustee requested that Defendants identify all transfers ANConnect made to its affiliates since 2015 and the purpose of those transfers. Ex. Y at pp. 5-6. Defendants refused to do so, objecting that the request sought "confidential information," was "overbroad" and "irrelevant," and stating that data which may be necessary to respond to the request was either in remote storage or on a deactivated server. *Id.*

## II.    SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in favor of the non-moving party. *In re Maxus Energy Corp.*, 615 B.R. 62, 69 (Bankr. D. Del. 2020). "[W]here the record could lead reasonable minds to draw conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.* (internal quotation marks omitted).

III.   **ARGUMENT**

   A.   **The Court Need Not Engage in a Choice of Law Analysis Because Delaware and Texas Have Both Adopted the UFTA, and Defendants' Motion Should Be Denied Under Either State's Law**

Defendants argue that Texas law governs the Trustee's actual fraudulent transfer claim, both for statute of limitations/repose and for substantive purposes, because Texas has the "most significant relationship" to this case. *See* Defs. Br., Adv. D.I. 41 at p. 17. While Defendants' argument fails for the reasons discussed below, it is unnecessary for the Court to make a choice of law determination because Delaware and Texas have adopted substantively identical versions of the Uniform Fraudulent Transfer Act (generally, "UFTA," as enacted in Texas, "TUFTA," and as enacted in Delaware, "DUFTA").[5]

The first step in a choice of law analysis is to "determine if there is an actual conflict between competing state laws." *In re Am. LaFrance, LLC*, 461 B.R. 267, 272 n.5 (Bankr. D. Del. 2011). "If two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If there is a conflict, the Court applies the choice of law principles of the state in which it sits. *See Am. LaFrance*, 461 B.R. at 272. Delaware applies the "most significant relationship" test. *See In re Mervyn's Holdings, LLC*, 426 B.R. 488, 496 n.6 (Bankr. D. Del. 2010).

The Court need not engage in a choice of law analysis because the actual fraudulent transfer provisions of DUFTA and TUFTA, as well as the applicable statutes of limitations/repose, are substantively identical. *See* Opinion and Order, Adv. D.I. 20, at pp. 7-10 (discussing relevant provisions of DUFTA and TUFTA, and holding that result of Defendants' motion to dismiss would

---

[5] Indeed, Defendants acknowledge that "the result under either [Texas or Delaware] law would be the same" because both states "have adopted the [UFTA]." Defs. Br., Adv. D.I. 41 at p. 18 n. 92.

be the same under either state's law); *see also, e.g.*, *Mervyn's Holdings*, 426 B.R. at 496 n.6 (declining to decide which of three states' laws applied to fraudulent transfer claims when they had all "similarly adopted the UFTA, and therefore the result is the same regardless of the choice of law issue").

Moreover, even if a choice of law analysis was necessary, the balance of the "most significant relationship" factors weigh in favor of the application of Delaware law: the Debtors are Delaware entities and were thus injured in Delaware; the bulk of the Transfers at issue were made to Anderson Media, a Delaware corporation; and the Transfers were made to escape liability for counterclaims brought by the Debtors in Delaware state court. *See In re FAH Liquidating Corp.*, 572 B.R. 117, 129 (Bankr. D. Del. 2017) (listing the contacts to be considered in applying the most significant relationship test: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." (quoting Restatement (Second) of Conflict of Laws § 145)).  Defendants argue that Texas law applies because ANConnect is organized in Texas and maintained its office there— but even to the extent that is true, the evidence shows that ANConnect was dominated and controlled by its Delaware-incorporated parent, Anderson Media.  *See infra* Section III.B.2.b.

B.      **Defendants are Not Entitled to Summary Judgment on the Trustee's Actual Fraudulent Transfer Claims**

Under both DUFTA and TUFTA, a transfer is avoidable as to a creditor when it was made with "actual intent to hinder, delay, or defraud any creditor of the debtor."  *See* 6 Del. C. § 1304(a)(1); Tex. Bus. & Com. Code § 24.005(a)(1).  Defendants argue that the Trustee's claims fail on the merits because (1) Alchemy was not a creditor of ANConnect, and (2) the Trustee cannot show actual fraudulent intent.  These arguments are monumentally specious—Alchemy

was plainly a "creditor" of ANConnect as that term is defined in the UFTA, and the evidence establishes numerous badges of fraud creating disputes of material fact concerning intent.

### 1.    Debtor Alchemy Was a Creditor of ANConnect

Defendants argue, without citing any legal support, that they are entitled to summary judgment because Alchemy was "not a net creditor" of ANConnect at the time of the payments. Defs. Br., Adv. D.I. 41, at p. 24.  In Defendants' view, a plaintiff can only assert a claim under the UFTA if an analysis of the parties' respective claims against one another shows plaintiff is a "net creditor" instead of a "net debtor" of the transferee.  This argument must be rejected as contrary to the plain language of the statute, which leaves no doubt that Alchemy was a creditor of ANConnect when the Transfers were made.

A "creditor" under the UFTA simply means "a person who has a claim."  6 Del. C. § 1301(4); *accord*  Tex. Bus. & Com. Code § 24.002(4).  A "claim," in turn, means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  6 Del. C. § 1301(3); *accord* Tex. Bus. & Com. Code § 24.002(3).  These definitions contain no reference – and leave no room – to support Defendants' "net" creditor defense.

There is no dispute that, when the Transfers were made, Alchemy had asserted Counterclaims against ANConnect.  *See* Defendants' Answer (Adv. D.I. 28), at ¶ 54 ("Defendants admit that, in June and August 2016, Alchemy had asserted counterclaims against ANConnect."). Given the broad definitions set forth in the UFTA, the Counterclaims clearly constitute a "claim" and Alchemy clearly constitutes a "creditor."  Alchemy is also a creditor of ANConnect by virtue of asserting claims against it in the Companion Adversary.  Alchemy's claims in that action arise out of the ANConnect Transaction (which closed in July 2015), ANConnect's withholding of

Alchemy's receivables, and related dealings between the parties prior to Alchemy's bankruptcy filing on July 1, 2016.

The one case cited in support of Defendants' argument that Alchemy is not a creditor, *Williams v. Performance Diesel, Inc.*, 2002 WL 596414 (Tex. App. Apr. 18, 2002), is readily distinguishable. There, the court held that evidence showing nothing more than that money passed between the parties' accounts was insufficient to establish a creditor-debtor relationship. *See id.* at *4.[6] The *Williams* decision has no relevance to this case. Alchemy's creditor status is not based on the "mere alleged passing of money" (*id.*) between entities. Moreover, unlike this case, *Williams* did not involve a lawsuit filed a few months before the transfers were made.

Nor does *Williams* say anything about performing a "net creditor"/"net debtor" analysis. Indeed, Defendants do not cite *any* support for their net creditor argument. UFTA does not reference any such analysis in its definitions of the relevant terms or in its actual fraudulent transfer provisions. In stating that "'Creditor' means a person who has a claim," for example, there are no caveats concerning the net amounts owed. 6 Del. C. § 1301(4). The Court should resist Defendants' effort to rewrite that statute to impose conditions that simply do not exist.

Ignoring the statutory language, Defendants contend that the Trustee's claims in *this* adversary proceeding do not render Alchemy a creditor at the time the Transfers were made. This

---

[6] The *Williams* court also commented (in *dicta*) that certain default judgments entered 5-6 years after the transfers did not establish the plaintiff's standing as a creditor to avoid the earlier transfers. *See Williams*, 2002 WL 596414, at *4 (court explaining it would reject this argument, had it been raised). The court concluded as such because the language in § 24.005(a) of TUFTA states that a fraudulent transfer cause of action is available to a creditor whose "claim arose before or *within a reasonable time* after the transfer was made." Tex. Bus. & Com. Code § 24.005(a) (emphasis added). DUFTA is broader in this regard, stating simply that the creditor's claim can "ar[i]se before or after the transfer was made." 6 Del. C. § 1304(a). This slight difference in statutory language is not relevant here (and does not create a conflict for choice of law purposes) because, as discussed herein, Alchemy has claims against ANConnect that arose before the Transfers.

argument is a red herring. The Trustee's Complaint does not rely on the fraudulent transfer claims in this adversary as the basis for Alchemy's creditor status when the Transfers were made—it relies on the Counterclaims that arose and were filed *before* the Transfers were made, as well as the claims that were asserted against ANConnect in the Companion Adversary (which arose out of the ANConnect Transaction in July 2015 and other pre-petition conduct). *See* Adv. D.I. 1, at ¶¶ 44-48. The fact that ANConnect disputes its liability for those claims, or believes it is entitled to an "equitable setoff" as it asserted in the Delaware State Court Action, is irrelevant to Alchemy's status as a creditor for purposes of UFTA. *See, e.g.*, 6 Del. C. § 1301(3) ("claim" includes "disputed" claims, "unliquidated" claims, and claims not yet reduced to judgment); Tex. Bus. & Com. Code § 24.002(3) (same).

### 2. Evidence Supports at Least *Nine* Badges of Fraud Demonstrating Actual Fraudulent Intent

Because parties to an actual fraudulent transfer rarely acknowledge their fraudulent intent, courts in both jurisdictions rely on "badges of fraud" as circumstantial proof of actual fraudulent intent. *See* Opinion and Order, Adv. D.I. 20, at p. 9; *see also, e.g.*, *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 370 (S.D. Tex. 2008) (applying DUFTA: "Actual fraudulent intent is rarely susceptible to direct proof; therefore, the requisite intent may be proved circumstantially by presenting evidence of certain 'badges of fraud' that may cumulatively give rise to an inference of intent to hinder, delay, or defraud."); *Jones v. Dyna Drill Techs., LLC*, 2018 WL 4016413, at *5 (Tex. App. Aug. 23, 2018) (citing the above-quoted language from *ASARCO* as applicable to TUFTA).

The badges of fraud include, but are not limited to, those set forth in UFTA:

> In determining actual intent [for purposes of the actual fraud provision], consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider; (2) The

13

debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

6 Del. C. § 1304(b); *accord* Tex. Bus. & Com. Code § 24.005(b) (enumerating the same badges of fraud).

"A court may, of course, consider factors other than the traditional badges of fraud in an analysis of fraudulent intent," such as, for example, if the "natural consequence" of the transfer is that creditors were hindered, delayed, or defrauded. *In re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011). Ultimately, the determination of whether a transfer was made with fraudulent intent is fact-intensive and best reserved for the trier of fact. *See Flores v. Robinson Roofing & Const. Co.*, 161 S.W.3d 750, 754–55 (Tex. App. 2005) ("Intent [under TUFTA] is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. The question of whether a [transferor] conveyed property with the intent to defraud creditors is 'ordinarily a question for the jury or the court passing on the fact.'") (citations omitted); *In re Maxus Energy Corp.*, 641 B.R. 467, 522 (Bankr. D. Del. 2022) ("Not surprisingly, [DUFTA's] badges of fraud are questions of fact and not questions of law. . . . Whether any badge of fraud can be established is a question for trial.").

"Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive

evidence of an actual intent to defraud." *In re Our Alchemy, LLC*, 2019 WL 4447545, at *6 (Bankr. D. Del. Sept. 16, 2019); *see also In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (under TUFTA, "[n]ot all, or even a majority, of the 'badges of fraud' must exist to find actual fraud.  Indeed, '[w]hen several of these indicia of fraud are found, they can be a proper basis for an inference of fraud.'") (quoted reference omitted).

Here, the evidence conclusively establishes – or, at a minimum, demonstrates a genuine dispute of material fact concerning – at least *nine* badges of fraud:

### a.    The Transfers Were Made to Insiders of ANConnect – Badge (b)(1)

Defendants concede that the Transfers were made to insiders.  *See* Defs. Br., Adv. D.I. 41, at p. 26 ("**Badge One: Was the transfer or obligation to an insider?  Yes.**  [AMS] is a company related to ANC[onnect] through a common parent, Anderson Media.") (emphasis in original); *see also* Defendants' Answer (Adv. D.I. 28), at ¶ 72 ("Defendants admit that Anderson Media and AMS are insiders of ANConnect.").

Defendants contend that the Transfers at issue were made to AMS (not Anderson Media), but their own contemporaneous documents state that ANConnect made all but the June 2016 AMS Transfer ($1,096,320) to its parent, Anderson Media.  That factual dispute will have to be resolved by the trier of fact, but for purposes of this badge of fraud there is no dispute that the Transfers were made to insiders of ANConnect.[7]

---

[7] UFTA defines the term "insider" to include, inter alia, "[a] person in control of the debtor," "[a]n affiliate, or an insider of an affiliate as if the affiliate were the debtor," and "[a] managing agent of the debtor."  6 Del. C. § 1301(7); accord Tex. Bus. & Com. Code § 24.002(7).   Thus, Anderson Media and AMS are plainly insiders of ANConnect within the meaning of the UFTA. *See* Defendants' Answer (Adv. D.I. 28), at ¶ 9 ("Defendants admit that ANConnect is wholly owned by Anderson Media..."), ¶ 10 ("Defendants admit that AMS is wholly owned by Anderson Media and is the sole Manager of ANConnect.").

**b.** **ANConnect Effectively Retained Control of the Property Transferred, Because Defendants Operate as a Consolidated Enterprise – Badge (b)(2)**

The Anderson group of companies, including ANConnect, operate as a consolidated enterprise under the dominion and control of Anderson Media officers such as Jay Maier.  For example, in June 22, 2016, Maier, as CFO of Anderson Media, sent an email to ANConnect and Anderson Merchandisers (another affiliate) instructing them to effectuate an offset transaction—which they did without question.  *See* Ex. Z (June 22, 2016 email); Ex. L, Maier Dep. at 37:9-22 (confirming offset transaction completed before June 30, 2016).  Notably, Maier's instructions include the following: "Should we find via a Court decision that the offset was inappropriate, we can later reverse it" (Ex. Z)—indicating that Anderson Media and its affiliates simply change the disposition of monies as they see fit.

Further, Defendants admit that they transfer cash back and forth between ANConnect and Anderson Media as they see fit: "These transfers [described in ¶ 27 of Maier Decl., Adv. D.I. 41-1] only changed the custodian of ANC[onnect]'s remaining cash balances. . . . Whenever ANC[onnect] needs funds to pay its debts . . . Anderson Media transfers cash to ANC[onnect] . . . ."  Adv. D.I. 41-1, Maier Decl., ¶¶ 27-28 (describing various "intercompany" transfers made after April 2017).[8]  Maier's bald assertion does nothing to legitimize the Transfers, and instead confirms that monies were freely moved and recharacterized between Defendants to meet the exigencies of the moment.  It further suggests that ANConnect, despite transferring funds to an affiliate, continues to retain control and the ability to use the funds for its benefit, should it decide to pay

---

[8] While the Maier Declaration refers to a purported "intercompany balance due from Anderson Media" (Adv. D.I. 41-1 at ¶ 27), Defendants submitted no evidence showing that the over $23 million upstreamed from ANConnect via the Transfers was treated as part of any intercompany debt arrangement between the entities, and the evidence adduced by the Trustee shows the contrary.  *See, e.g.,* Ex. M at ANConnect-OurAlch0032102.

particular creditors (while purporting to be judgment proof to others).  *See Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 F. App'x 924, 928 (Fed. Cir. 2005) (affirming district court's finding of actual fraudulent intent where arrangement between insiders permitted company to "pay unsecured creditors as it sees fit, while effectively avoiding its obligations toward [another] creditor," because this arrangement was not as "innocent" as defendant suggested).

This manner of operation raises a genuine dispute of material fact as to whether ANConnect retained control of the funds after the Transfers.  *See In re Roti*, 271 B.R. 281, 297 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Nelmark v. Helms*, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003) (finding multiple badges of fraud, including that the transferor "retained control of the funds after the transfers," where he placed assets in the names of insiders to frustrate another creditor); *Maxus Energy*, 641 B.R. at 516-17 (denying summary judgment on badge concerning whether transferor retained control of assets, where there were material factual disputes concerning how assets flowed and were controlled between several entities).

> **c.   The Transfers Were Concealed and Constituted the Removal of ANConnect's Assets – Badges (b)(3) and (b)(7)**

Badges of fraud include if the transfer was "concealed" and if "[t]he debtor removed or concealed assets."  6 Del. C. § 1304(b).  Here, the Transfers were concealed: (i) ANConnect is a private company with nonpublic finances; (ii) the articles and press releases to which Defendants point concerning asset sales or the company going out of business contain no information disclosing insider transactions or other specifics that would lead a creditor to discover the Transfers or their fraudulent nature; and (iii) ANConnect and its counsel misrepresented the magnitude of the Transfers to the Trustee and his counsel, representing that they were relatively "minor" and only amounted to a few million dollars (rather than almost $24 million).  *See* discussion *infra* Section III.C.

The Transfers—particularly the distributions made to Anderson Media—also constituted the "removal" of assets, insofar as they removed cash that was available for creditors by transferring it to ANConnect's parent company in exchange for nothing. *See Maxus Energy*, 641 B.R. at 520-21 (finding genuine dispute of material fact as to whether "removing assets and stranding liabilities" was intended to conceal the transfers from creditors).; *In re Ritz*, 567 B.R. 715, 749 (Bankr. S.D. Tex. 2017) (transferring money out of debtor's account into affiliates' accounts constituted a removal of assets).

> **d.   The Transfers Were Made in the Months Following Alchemy Filing Substantial Counterclaims Against ANConnect – Badges (b)(4) and (b)(10)**

The Counterclaims filed by Alchemy on April 11, 2016 in the Delaware State Court Action establish that Alchemy was a pre-petition creditor of ANConnect. *See* Ex. J, at pp. 46-63. Thus, the Transfers—made in June and August 2016—were made shortly after ANConnect was on notice of a substantial claim against it. Alchemy formally asserted claims in excess of $6 million (*see id.*, p. 60 at ¶¶ 41-42)—concerning receivables belonging to Alchemy that ANConnect admitted were in its possession and being withheld. *See supra* Section I.B. That ANConnect erroneously believed it was entitled to keep those funds as an "equitable setoff" is irrelevant to Alchemy's status as a creditor. Furthermore, Alchemy had formally denied all liability for ANConnect's claims. *See* Ex. J at pp. 29-43 (denying all liability to ANConnect in the Delaware State Court Action). ANConnect nonetheless made almost $24 million in cash payments (substantially all of its assets, as discussed *infra*) to related parties before the claims were resolved and without maintaining appropriate reserves. *See* Ex. Q (listing "[p]ayments to parent" of $23.8 million).

e.    **The Transfers Consisted of Substantially all of ANConnect's Assets – Badge (b)(5)**

Some courts have held that "substantially all" of a debtor's assets means a "significant percentage," above 50% and perhaps closer to 85% or 95%. *Ritz*, 567 B.R. at 745. Others have held that "substantially all" does not necessarily mean the majority of the assets. *See In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *14 (Bankr. D. Del. Oct. 9, 2012) (interpreting "substantially all" to mean transfers that "fundamentally change[]" the company or are substantial transfers outside the course of business, even if they constitute below 50% of the total assets).

Under either view, the Transfers constituted substantially all of ANConnect's remaining assets in mid-2016. Defendants admit ANConnect liquidated its assets in 2016, and that the Transfers were made as part of that liquidation process. *See* Defendants' Answer (Adv. D.I. 28), at ¶ 9; Adv. D.I. 41-1, Maier Decl., ¶¶ 18, 24. While Defendants point to proceeds from liquidation sales in April and July 2016, they also admit to having made other payments to Anderson Media relating to the Bank of America loan before the Transfers that are at issue in this case. *See id.* at ¶¶ 17-18. Defendants claim they still had "about $3 million left in residual cash" after the liquidation, *id.* at ¶ 34, but the Transfers totaled almost $24 million—far in excess of any residual cash left to pay remaining creditors. Defendants further state that as of March 2017—less than one year after the Transfers—ANConnect had only $650,000 in "remaining cash," which it also transferred to Anderson Media (along with all further collections it received after April 2017). *Id.* at ¶¶ 26-27. This demonstrates that ANConnect had minimal cash on hand in the months following the Transfers (when it was insolvent, as discussed *infra*). The transfer of nearly all the company's remaining cash to a parent company as part of a liquidation constitutes a fundamental change to the company, a transfer outside the ordinary course of business, and a transfer of a significant

19

percentage of the remaining assets, for purposes of this badge of fraud.  *See Vaso*, 2012 WL
4793241, at *14; *Ritz*, 567 B.R. at 745.

> **f.**      **The Transfers Rendered ANConnect Insolvent – Badge (b)(9)**

In the years preceding the Transfers, ANConnect reported substantial operating losses and
negative EBITDA, and the Transfers of its cash reserves rendered ANConnect insolvent.  *See
supra* Section I.C.  Under the UFTA, "[a] debtor is insolvent if the sum of the debtor's debts is
greater than all of the debtor's assets, at a fair valuation."  6 Del. C. § 1302(a); *accord* Tex. Bus.
& Com. Code Ann. § 24.003(a).  ANConnect's internal balance sheet as of September 30, 2016—
at the end of the same quarter in which the Transfers were made, and after all of its business lines
had been sold—reflects that ANConnect's liabilities totaled $20,175,350.55, while assets totaled
$12,972,382.12.  *See* Ex. U.  The trial balance thus establishes that the sum of ANConnect's debts
exceeded the sum of its assets by $7.2 million (even before accounting for the $8 million in
Alchemy's improperly-withheld receivables).

> **g.**      **The Transfers Were Made for no or Insufficient Consideration
> – Badge (b)(8)**

It is a badge of fraud if the transferor did not receive reasonably equivalent value in
exchange for the Transfers.  This analysis requires determining whether the transferor received
*any* value in exchange for the transfer and, if so, whether that value was reasonably equivalent.
*See Maxus Energy*, 641 B.R. at 521.  Here, ANConnect failed to receive reasonably equivalent
value in exchange for the Transfers because: 1) distributions on account of equity interests—which
account for the bulk of the Transfers—do not confer value on the transferor, and 2) to the extent
the Transfers were payments for management services provided by AMS, those payments far
exceeded the actual value of the services.

Equity distributions do not confer "value" upon the transferor as a matter of law.  *See In re SemCrude, L.P.*, 2013 WL 2490179, at *5 (Bankr. D. Del. June 10, 2013), *aff'd*, 526 B.R. 556 (D. Del. 2014), *aff'd*, 648 F. App'x 205 (3d Cir. 2016).  "Value" is given under the UFTA if "property is transferred or an antecedent debt is secured or satisfied."  6 Del. C. § 1303(a); *accord* Tex. Bus. & Com. Code Ann. § 24.004(a).  Under this definition distributions made on account of equity interests do not confer "value" upon the transferor.  *See SemCrude*, 2013 WL 2490179, at *5 (finding partnership distributions conferred no value on debtors under Bankruptcy Code)[9]; *see also, e.g.*, *In re David Cutler Indus., Ltd.*, 502 B.R. 58, 75 (Bankr. E.D. Pa. 2013) (where payments were "accurately characterized as distributions . . . on account of [an] equity interest in DCI," "[i]t follows that DCI did not receive reasonably equivalent value in return for the Transfers"); *In re Brentwood Lexwood Partners, LLC*, 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003).

Here, the bulk of the Transfers were made to Anderson Media as distributions on account of Anderson Media's 100% ownership interest in ANConnect.  The June 2016 AM Transfer, in the amount of $10 million, is specifically characterized as a "Distribution to Media" in ANConnect's records.  *See*  Ex. M; *see also* DISTRIBUTION, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "distribution" as "[t]he act or process of apportioning or giving out" and "corporate distribution" as "[a] corporation's direct or indirect transfer or money or other property . . . to or for the benefit of its shareholders, such as a dividend payment").  And, while the August 2016 Transfer and Additional Transfer are referred to vaguely as "Payments" or "Special payments" in ANConnect's records (*see* Exs. Q, P, N), there is no credible record evidence demonstrating that they were made in exchange for anything from Anderson Media or

---

[9] The Bankruptcy Code's fraudulent transfer provisions define "value" in a similar manner as the UFTA: "'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor..."  11 U.S.C. § 548(d)(2)(A).

that they pertained to any debt owed by ANConnect.  As equity distributions, the June 2016 AM

Transfer, August 2016 Transfer, and Additional Transfer (together, amounting to over $22 million)

conferred no value upon ANConnect.

Defendants attempt to justify certain of the Transfers by asserting that they were actually

made to AMS as payment for "management services and flight department costs"[10] but this

argument fails for several reasons.  *First*, it is contradicted by the contemporaneous evidence

showing the payments were made to Anderson Media, not AMS.  *Second*, the amounts far exceed

the fair value of the services that could have been rendered by AMS.

Reasonably equivalent value is an "inherently fact driven" analysis that examines the

"totality of the circumstances" based on "the good faith of the parties, the difference between the

amount paid and the market value, and whether the transaction was at arms length." *Maxus

Energy*, 641 B.R. at 521 (citation omitted).  Here, the Transfers were between insiders, not arms

length transactions, and there are material facts in dispute concerning the parties' good faith given

the numerous badges of fraud.

As for the fair market value of services provided by AMS to ANConnect and other

Anderson affiliates, AMS represented in an answer it filed as a defendant in an adversary

proceeding that was part of the bankruptcy of Anderson News, LLC (another Anderson affiliate)

that it provides "business and management services to the various entities within the Anderson

companies" but that its "costs were principally personnel, professional fees and travel/aviation."

---

[10] Adv. D.I. 41-1, Maier Decl., ¶¶ 21, 23.  To the extent Defendants rely on these payments being
"properly recorded in ANC[onnect] and [AMS's] books and records" (*id.*), they have presented no
evidence supporting that assertion, and the record evidence contradicts it.  *See Ritz*, 567 B.R. at
746 (giving no weight to self-serving testimony of value that was unsubstantiated by other
evidence).  Moreover, given that Defendants refused during discovery to give an explanation for
the transfers (or even to identify which transfers were made), *see* Ex. Y at pp. 5-6, their after the
fact rationalizations deserve short shrift.

Ex. AA (AMS Answer in Bankr. D. Del. Case No. 09-10695, Adv. No. 11-53811), at ¶ 11.  In this regard, AMS stated that "[i]t was established as a cost center" and all of its costs "were to be charged to and reimbursed by the affiliated entities that utilized its services." *Id.*  AMS further stated that it was "not a profit center" although its service agreement provided a "relatively small margin over its costs" that could be invoiced to companies in Anderson's corporate structure that used its services, such as ANConnect.  *Id.*

Thus, in a different situation AMS downplayed the amounts it charged as "relatively small" when it suited them, but now, in this litigation, maintains that not only the June 2016 AMS Transfer (which is itself in excess of fair value) but nearly the *entirety* of the $23.8 million of Transfers (minus a "Tennessee state tax loss carryforward" in an unidentified amount), Adv. D.I. 41-1, Maier Decl., ¶ 21, constituted reasonable payment for AMS's services.  Defendants' assertions lack credibility given that, as they also contend, ANConnect was in the process of liquidating and winding down its operations at the time.  *See Vaso Active Pharms.*, 2012 WL 4793241, at *15, *19 (finding genuine dispute of material fact as to the value of defendants' services where the business had essentially stopped operating).  The Court cannot determine on summary judgment how much was paid to AMC, let alone the fair value of services provided by AMS.  Resolution of these issues requires the weighing of evidence, credibility determinations, and findings by the factfinder.

### 3.    Defendants Have Not Proven a Legitimate Supervening Purpose for the Transfers

"Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent." *Maxus Energy*, 641 B.R. at 527.  Courts have held that "[a]t that point, 'the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue.'" *Id.* (applying DUFTA, citing *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998)); *see also In re The Heritage Org., L.L.C.*, 413 B.R. 438, 465 (Bankr. N.D. Tex.

23

2009) (applying TUFTA, and citing *Kelly* for the same principle).  Defendants cannot establish as a matter of law a legitimate purpose for the Transfers, and the existence of numerous badges of fraud doom their half-hearted attempt to do so.  Accordingly, "[a]t this point, it is premature and there are too many material facts in dispute for the Court to determine whether [ANConnect] had a legitimate supervening business purpose for effectuating the transfers at issue." *Maxus Energy*, 641 B.R. at 529; *see also The Heritage Org.*, 413 B.R. at 466-67 ("[T]he finder of fact[] is the sole judge of the credibility of the witnesses and can reject any explanations found to be not credible.").

### C.    There is a Genuine Dispute of Material Fact Regarding When the Transfers Could Have Reasonably Been Discovered by the Trustee

Delaware and Texas apply the same statute of repose/limitations for actual fraudulent transfer claims, which under the law of both jurisdictions must be brought "within 4 years after the transfer was made or the obligation was incurred, or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant."  6 Del. C. § 1309(1); *accord* Tex. Bus. & Com. Code Ann. § 24.010(a)(1).

The Trustee's actual fraudulent transfer claim is governed by the statutory language which allows claims to be brought within one year after the transfer was or could reasonably have been discovered, sometimes referred to in caselaw as the "discovery rule."  Under the laws of Texas and Delaware, that one-year period does not begin to run until the plaintiff knew of or could reasonably have discovered both the transfer and its fraudulent nature.  *See, e.g.*, *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589-90 (5th Cir. 2020); *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1239-40 (Del. Ch. 2019).  "When a plaintiff discovered or could reasonably have discovered a transfer is generally a question of fact for the fact-finder." *Janvey v. Romero*, 817 F.3d 184, 189 (5th Cir. 2016).

1.  **Testimony Concerning Statements Made in the September 13, 2018 Settlement Meeting do Not Establish That the Trustee's Claims are Untimely**

    a.  **The Statements Constitute Inadmissible Settlement Communications**

Under Federal Rule of Evidence 408, evidence of "conduct or a statement made during compromise negotiations about the claim" is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." FED. R. EVID. 408(a). "The court may admit this evidence for another purpose," FED. R. EVID. 408(b), but courts "take[] very seriously the obligation of parties not to disclose or reveal confidential communications made for the purposes of settlement." *Zas v. Canada Dry Bottling Co. of New York, L.P.*, 2013 WL 3285143, at *8 (D.N.J. June 27, 2013).

There is no dispute that the September 13, 2018 meeting referenced in Defendants' motion was a settlement conference pertaining to the Trustee's claims in the Companion Adversary. *See* Adv. D.I. 41-1, Maier Decl., ¶ 32 (purpose of meeting was "to explore settlement of the Trustee's claims"); Coren Decl., ¶¶ 4-5. Defendants seek to admit statements they made concerning the supposed uncollectability of an eventual judgment against them in the Companion Adversary as proof that the Trustee was on notice of the Transfers at issue in this case. Defendants thus seek to use statements made during compromise negotiations to prove/disprove when the claims "could reasonably have been discovered" for purposes of the UFTA.

The Court should find that these statements are inadmissible pursuant to Rule 408. *See Behlau v. Tiger Tiger Prods., LLC*, 2021 WL 981672, at *4 (D.N.H. Mar. 16, 2021), *reconsideration denied*, 2021 WL 1550459 (Apr. 20, 2021) (holding that statements in settlement demand letter intended to "impeach [plaintiff's] evidence . . . and to show that the statute of limitations bars the claim" was "not a permissible use under Rule 408"). Parties facing liability

regularly "cry poor" during settlement negotiations—if they could then turn around and use those self-serving statements to prove the plaintiff was on notice of unspecified fraudulent transfers once those transfers are revealed through other means, that would chill parties' willingness to engage in settlement negotiations and reward parties for misrepresenting the true state of their finances.

> **b.** **There Are Genuine Disputes of Material Fact Concerning Defendants' Disclosures During That Meeting, Which Were Insufficient To Establish Or Put the Trustee On Notice of any Potential Fraudulent Transfer Claim**

Should testimony concerning the September 13, 2018 settlement discussion be admissible, there is a dispute as to what was said and the reasonable interpretation of those statements. As to Defendants' alleged disclosures at the settlement meeting, "Mr. Maier stated that ANConnect was 'judgment proof,'" after which

> 7. [T]he Trustee and [Attorney Coren] attempted to drill down into specifics about ANConnect's finances, [and] were met with stonewalling . . . . In response to an inquiry about upstreaming, Mr. Maier and [ANConnect] Attorney [Grant] Stein stated that a small amount was transferred, saying something to the effect that the amount transferred was only "a million dollars or two."

> 8. [Attorney Coren] requested that ANConnect, which is a private company with nonpublic finances, support the contention that only one or two million dollars was upstreamed to its parent entities and that it was insolvent by providing supporting financial documents. Mr. Maier and Attorney Stein refused to provide any further information and stated that such information would follow only after the Trustee obtained a judgment.

> 9. In [Attorney Coren's] extensive experience representing Trustees . . ., it is typical for defendants to "cry poor" during settlement discussions, and [Attorney Coren has] represented Trustees which obtained significant financial recoveries from defendants who previously claimed to be judgment proof. Given this, the inadmissible nature of settlement discussions, and the relaxed rules concerning candor in the context of settlement discussions, [Attorney Coren] did not take the statements of Mr. Maier and Attorney Stein to be factual statements, but rather as incidental puffery typical to negotiation.

26

> 10. It was not until March 2021, when ANconnect made its document production in the Companion Adversary Proceeding, that the Trustee and [Attorney Coren] discovered that the actual amount upstreamed by ANConnect to its related entities was not one or two million dollars, as suggested by Attorney Stein and Mr. Maier during the September 2018 meeting, but was in fact nearly $24 million, an exponentially higher amount.

Coren Decl., ¶¶ 4-10 (footnote 1 omitted).

Attorney Coren's recollection of the meeting is corroborated by the deposition testimony of the Trustee and of William Homony, a partner at Miller Coffey Tate LLP, the Trustee's accountants and bankruptcy consultants. *See* Ex. V, Miller Dep. at 10:19-11:9, 13:5-19:19 (the Trustee testifies that ANConnect's attorney "said that there were certain minor transfers. . . you know, $1 million or $2 million or something like that. . . . he never said $29 million. Never. . . . I asked for the documentation. And I never got it. So, in my opinion, it was all posturing, and they didn't have any evidence to support that."); Ex. W, Homony Dep. at 77:19-78:5, 80:9-82:13 (Homony testifies that "I only recall Grant saying that in connection with the upstreaming comment, we asked how much, and I believe Grant said a few million dollars was upstreamed.").

This testimony refutes Maier's assertions that Defendants sufficiently informed the Trustee or his counsel of the Transfers or their magnitude, and instead shows that the truth concerning the magnitude of the Transfers was concealed by misrepresenting the amounts upstreamed as relatively minor. Resolution of these disputed issues of fact requires the weighing of evidence and credibility determinations that the Court cannot make on summary judgment.

Defendants' contention that the untruthful disclosures during the settlement discussion were sufficient to allow the Trustee to bring fraudulent transfer claims is preposterous. It is well-established that a fraudulent transfer claim is not adequately pleaded without sufficient specificity concerning the timeframe, amount, and fraudulent intent (whether established by direct evidence or via badges of fraud) of the challenged transfers. *See, e.g., In re PennySaver USA Publ'g, LLC,*

602 B.R. 256, 268 (Bankr. D. Del. 2019); *In re Zohar III, Corp.*, 631 B.R. 133, 169 (Bankr. D. Del. 2021). Defendants' vague disclosures during the settlement meeting would not meet this standard, and would likely have engendered a Rule 11 attack had the Trustee filed an avoidance action with such a paucity of facts. *See* Coren Dec. at ¶ 11. Moreover, the relatively small amount of potential upstreaming revealed to the Trustee (only "a million dollars or two" compared to the over $50 million in claims asserted against ANConnect and its affiliates in the Companion Adversary Proceeding) would not reasonably have justified the expense and burden of filing and prosecuting an additional adversary proceeding. *Id.*

### 2. The Transfers Could Not Have Been Reasonably Discovered Prior to ANConnect's March 2021 Document Production Revealing Them

It was not until March 2021, when ANconnect made its document production in the Companion Adversary, that the Trustee and undersigned counsel discovered that the actual amount upstreamed by ANConnect to its related entities was nearly $24 million. *See* Coren Decl. at ¶ 10; Ex. V, Miller Dep. at 19:6-20:7; Ex. W, Homony Dep. at 82:10-13; Ex. X (3/25/21 letter from ANConnect attorney conveying "ANConnect's first production"); Ex. M and Q (documents produced by ANConnect on 3/25/21 as part of its first production that for the first time disclosed to the Trustee the existence and magnitude of the transfers at issue).

The Trustee did not unreasonably delay or sit on his hands in discovering the Transfers, or in commencing this action upon discovering them. There is no basis for assuming that Defendants would have complied with Rule 2004 requests or other investigative means outside the discovery process in the Companion Adversary—indeed, in the Companion Adversary, ANConnect stonewalled the Trustee's efforts to take discovery, and sought partial summary judgment based

on an argument that discovery was unnecessary.[11]  Given their resistance to discovery directly related to the ANConnect Transaction, it is abundantly clear that ANConnect would not have cooperated with efforts to investigate ancillary internal transfers.  Incredibly, even during discovery in this adversary, ANConnect has refused to identify the transfers it made to its affiliates during the time period at issue.  *See* Ex. Y at pp. 5-6 (Defendants' blanket objection to interrogatories requesting ANConnect to identify transfers to its affiliates).

Nor could other creditors have reasonably discovered the Transfers or their fraudulent nature.  Defendant' argument, based on two news articles and a press release, that the claims are untimely because the liquidation was publicly disclosed, should be rejected.  These materials reference the Readerlink sale, employee layoffs, and the Alliance sale,[12] but contain no information about transactions with insiders, resolution of creditor claims, or how ANConnect's remaining assets would be handled.  *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 308 (E.D. Pa. 2011) (fact that plaintiffs knew defendant had received proceeds did not place them on notice of fraudulent transfers, where they had no reason to know the proceeds were being passed on to another entity).  And even to the extent a creditor could infer a poor financial condition, these materials come nowhere near providing the type of financial disclosures found in public filings with the SEC, for example.  General disclosures that ANConnect sold assets or was going out of business are not a sufficient basis upon which a creditor could have discovered insider transactions such as the Transfers, much less discovered their fraudulent nature.

[11] *See* Companion Adversary, Adv. No. 18-50633, D.I. 151 (Plaintiff's Memorandum in Support of His Request to Allow Discovery Pursuant to Federal Rule of Civil Procedure 56(d)), at pp. 9-10 (summarizing the Trustee's efforts to begin discovery, which were rebuffed by ANConnect); D.I. 241 (Opinion and Order denying ANConnect's premature summary judgment motion).

[12]     *See* Maier Decl. at Exs. 7-9.

The cases cited by Defendants are distinguishable. In *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, plaintiffs brought claims to avoid 25 loan transfers under TUFTA. 976 F.3d 585, 588 (5th Cir. 2020). The court held that the transfers could have been discovered earlier because the company had disclosed in a Form 10-K that it was making loan transfers of that type. *Id.* at 590. Additionally, plaintiffs' counsel had argued in a separate case that the loan transfers were happening (making clear they knew about them) and plaintiffs admitted they had possession of UCC filings that showed the transfers. *Id.* The facts in *Basic Cap. Mgmt.* thus bear no resemblance to the facts in this case.[13]

In short, Defendants have failed to establish the absence of a genuine issue of material fact with respect to when the Transfers and their fraudulent nature could have reasonably been discovered for purposes of the statute of limitations.

## IV.    <u>CONCLUSION</u>

In light of the foregoing facts and authorities, Plaintiff respectfully requests that Defendants' Motion be denied.

---

[13] *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311 (Tex. Ct. App. 2012), is also distinguishable. There, a judgment creditor discovered, via post-trial discovery to enforce his judgment, that proceeds from the sale of a beach house had been fraudulently transferred. *Id.* at 313-14. However, the court held that the creditor's TUFTA claims were untimely because it knew about the sale to the trust prior to the judgment even being entered *and* had the opportunity to conduct discovery as to the proceeds, but waited 3 years to do so and then did not commence his TUFTA suit until the statute of repose had passed. *Id.* at 315-17. It was key to the court's decision that the creditor knew about the sale since 2004, had post-trial discovery procedures available to him starting in 2005, and discovered the transfers in 2008 (still within the statute of repose), but did not file his suit until 2009 (beyond the statute of repose). *Id.* at 317. Here, no judgment has been entered, there are facts demonstrating why the Transfers were not discovered earlier, and the Trustee did not delay bringing suit upon discovering them.

Dated: July 31, 2023

Respectfully submitted,

/s/ John T. Carroll, III
John T. Carroll, III (DE Bar No. 4060)
**COZEN O'CONNOR**
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
Fax: (302) 295-2013
jcarroll@cozen.com

-and-

Steven M. Coren, Esq. *(pro hac vice)*
Andrew J. Belli, Esq. *(pro hac vice)*
**COREN & RESS, P.C.**
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
abelli@kcr-law.com

*Counsel for Plaintiff*
*George L. Miller, Ch. 7 Trustee*