IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 7 |
| | . | |
| OUR ALCHEMY, LLC, *et al.*, | . | Case No. 16-11596 (JTD) |
| | . | |
| Debtor. | . | (Jointly Administered) |
| | . | |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| GEORGE L. MILLER, as Chapter 7 | . | |
| Trustee, | | |
| | . | Adversary Proceeding |
| Plaintiff, | . | No. 18-50633 (JTD) |
| | . | |
| v. | . | |
| | . | |
| ANCONNECT, LLC, et al. | . | |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| GEORGE L. MILLER, as Chapter 7 | . | |
| Trustee, | | |
| | . | Adversary Proceeding |
| Plaintiff, | . | No. 21-51420 (JTD) |
| | . | |
| v. | . | |
| | . | |
| ANDERSON MEDIA CORPORATION, *et al.* | . | |
| . . . . . . . . . . . . . . . | | |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
<u>UNITED STATES BANKRUPTCY JUDGE</u>

Audio Operator:          Sharon A. Page, ECRO


Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Appearances:

| | |
|---|---|
| Counsel to George L.<br>Miller, Chapter 7<br>Trustee: | Cozen O'Connor<br>BY:  JOHN T. CARROLL, ESQ.<br>1201 N. Market Street<br>Suite 1001<br>Wilmington, DE  19801<br>Email:    jcarroll@cozen.com |
| | Coren & Ress, P.C.<br>BY:  ANDREW J. BELLI, ESQ.<br>Two Commerce Square<br>2001 Market Street, Suite 3900<br>Philadelphia, PA 19103<br>Email:    abelli@kcr-law.com |
| Counsel to Defendants: | Troutman Pepper Hamilton Sanders LLP<br>BY:  EVELYN J. MELTZER, ESQ.<br>Hercules Plaza, Suite 5100<br>1313 N. Market Street<br>Wilmington, DE  19899-1709<br>Email:    evelyn.meltzer@troutman.com |
| | Hungering Rubin Field Law<br>BY:  DAVID HUNGERING, ESQ.<br>Peachtree 25th, Suite 599<br>1718 Peachtree Street<br>Atlanta, GA  30309<br>Email:    david@hungelinglaw.com |

**INDEX**

**ORAL ARGUMENTS**

Oral Argument Regarding Plaintiff's Motion for Partial Summary Judgment - Adversary No. 18-50633

Oral Argument Regarding Defendant, ANConnect, LLC's Renewed Motion for Partial Summary Judgment on Counts I, II, III, and V of the Trustee's Complaint - Adversary No. 18-50633

Oral Argument Regarding Defendants' Motion for Summary Judgment - Adversary No. 21-51420

**RULINGS**

All motions taken under advisement

1            THE COURT:  Good afternoon, everyone.  Thank you,
2    you may be seated.
3            All right.  This is the time we set for several
4    summary judgment motions.  Correct?  So whenever you're ready.
5    Who goes first?
6            MR. BELLI:  Your Honor, we actually have a dispute
7    about this.  I thought the Trustee's motion should go first
8    being first filed, but Mr. Hungelin disagreed and felt that
9    his motion should go first because one of his motions was a
10   renewed motion.
11           THE COURT:  Okay.
12           MR. HUNGERING:  Good afternoon, Your Honor.  We're
13   happy to -- David Hungelin, I represent ANConnect.  First of
14   all, thank you for allowing me to appear in this court.  And
15   with me is Evelyn Meltzer who is my local counsel.
16           I had just made a suggestion and we're happy to
17   handle it in whatever way the Court prefers.
18           THE COURT:  Why don't you go first?
19           MR. HUNGERING:  Okay.
20           THE COURT:  Just picking randomly.
21           MR. HUNGERING:  Thank you, Your Honor.  So, Judge,
22   this is ANConnect's renewed motion for summary judgment.  And,
23   Your Honor, we had sent a couple of documents, this is a very
24   voluminous case, and so I tried my best to try to focus on a
25   handful of documents that we think support our motion, and I

1   have brought a binder if Your Honor cares to look at things in

2   paper form.

3          THE COURT:  No, I have them electronically.  Thank

4   you.  I don't take, I don't take binders.

5          MR. HUNGERING:  Okay.  So the motion for summary

6   judgment, the renewed motion, we are moving because we don't

7   believe that the trustee has the evidence to establish that

8   there was not reasonably equivalent value that was given when

9   ANC sold it's assets to Our Alchemy.

10         There was a motion filed back in 2020.  In response

11   to that, the trustee moved under Rule 56(b) to be permitted to

12   pursue discovery.  There were several extensions to the

13   discovery order.  And during the discovery and all of these

14   extensions, what the trustee did not conform with is any

15   expert testimony or an expert report to show that there is a

16   genuine issue of material fact as to the value of the assets

17   that were transferred and as to Alchemy either being insolvent

18   at the time of the transaction or rendered insolvent as a

19   result of it.

20         Your Honor, at, what we had emailed to the Court at

21   Exhibit B is a timeline.

22         THE COURT:  Actually, I'm having trouble opening the

23   binder that was sent.

24         MR. HUNGERING:  I have a paper form of the timeline.

25    Maybe --

1          THE COURT:  Yeah, it's not opening on my computer, I
2  don't know why.

3          MR. HUNGERING:  May I hand up a paper form?

4          THE COURT:  Yes.  Thank you.

5          MS.  MELTZER:  Your Honor, Evelyn Meltzer, I will
6  ask someone in my office to resend it to see if we can get
7  something that you're able to open.  I apologize.

8          THE COURT:  It opened for me before on my desk
9  computer in my chambers, I don't know why it's not opening on
10  the bench here.

11          MS. MELTZER:  So would you like me to have it
12  resent?

13          THE COURT:  Yeah, let's try and resend it.

14          MS. MELTZER:  Thank you, Your Honor.

15          MR. HUNGERING:  There are about five or six
16  documents, Your Honor, that I was going to point the Court to
17  which I still have in paper form, so just let me know.

18          We have a highly diligence, fairly complicated
19  transaction wherein Our Alchemy wanted to purchase the video
20  distribution business from ANConnect.  ANConnect distributed
21  books, music and CDs and DVDs mostly to Walmart, Best Buy,
22  Sam's Club, and Wholesale.  Alchemy's executives were
23  interested in purchasing the video portion, and so they talked
24  about and came to ANConnect asking to buy this piece of the
25  business.

1          Our Alchemy was represented by an investment banking

2    firm, SunTrust Robinson Humphrey.  Our Alchemy hired BDO to

3    conduct due diligence and looking at ANConnect's books and

4    records.  They had outside counsel, the law firm Strook.

5          This deal was financed by SunTrust Bank.  SunTrust

6    Bank also had its own underwriters that were reviewing the

7    financials and running their own projections.  SunTrust was

8    represented by another outside law firm.  And this took place,

9    the due diligence, over an extended period of time.

10         The issues that the trustee has come forward with

11   which he is referring to as red flags were things like a

12   general decline in this market which everyone was aware of.

13   Some of the other financial issues that the trustee talks

14   about, all of which were fully considered by Our Alchemy's

15   executives.

16         They signed a term sheet, Alchemy and ANC did, in

17   February of 2015 setting out the purchase price and saying

18   we're going to go conduct our due diligence.  And if all is

19   good, we will close on this.  Veedeo (phonetic) issued a due

20   diligence report on the earnings in April of 2015.

21         In May they signed an asset purchase agreement with

22   a purchase price of $37 million and change.  Robinson Humphrey

23   pitches this deal to other lenders.  And in fact, the

24   financing that these banks put up came from three different

25   banks, each of those banks also conducted their own due

1  diligence.

2        In June of 2015, SunTrust internally, their

3  underwriters, make a recommendation to increase the amount,

4  they already had an existing credit facility that they had

5  given to Alchemy, of increasing that to help finance the deal.

6  Ultimately, the transaction closed on July 9th of 2015.  The

7  banks lend 14 and a half million, and importantly the equity

8  investor, which is Virgo, put in another 25 million.  So you

9  also had Virgo and their experts looking over this deal.

10        Tab 13, which was illegible in the [indiscernible]

11        THE COURT:  I was able to get it open, by the way.

12  I got the electronic binder open.

13        MR. HUNGERING:  Okay.  What Tab 13 says, and this is

14  the flow of funds, they have 25 million coming in from Virgo

15  Clarison (phonetic) and then you have a combined, about

16  fourteen and a half million coming in from the banks.  29

17  million of it was paid in cash to ANC.  All of those proceeds

18  went to pay a bank loan that ANC had with Bank of America.

19        This is not the kind of evidence to support a

20  fraudulent conveyance where there is this belief that the

21  transaction was between insiders or there was something wrong

22  with how the deal was marketed.  It was fully due diligence.

23        After it closed, Our Alchemy began to suffer

24  economic problems, not as a result of this transaction, but as

25  a result of what we call its legacy business.

1          SunTrust issues a downgrade memo in January of 2015,
2   where it notes that Our Alchemy is out of compliance with the
3   loan covenants.  However, it does note that the assets
4   purchased from ANConnect are actually performing as they had
5   projected.
6          Your Honor, at Tabs 7 and 8, we have a document
7   produced to us from the trustee, this comes from Alchemy.
8   Alchemy had conducted, was trying to figure out how to do a
9   restructuring of their bank note.  And in doing that, they put
10  together this confidential information memorandum.
11         And if you turn to the second page of this, and this
12  is from Docket No. 315-3 at page 49, it notes, they're showing
13  the financials, the standalone business of Our Alchemy lost
14  2.4 million.  When you combine it with what the ANConnect
15  assets added, it gets to 6 million.  That means that the
16  ANConnect assets generated about 8.4 million in EBITDA.  This
17  is a, not quite a year after the transaction.
18         Why is that important?  If you look at Exhibit 8,
19  this was a lender presentation that was, this material was put
20  together by SunTrust Robinson Humphries to be presented to
21  other lenders to be part of this new financing.  And this is
22  Docket No. 258, I'm sorry, Docket No. 315-2 at page 258.
23         When SunTrust underwrote this loan, they were
24  projecting that they, they called it Red Cloud, that was the
25  name of the transaction, but that's the ANConnect assets that

1  were purchased, would add about 8.5 million to EBITDA.  What

2  actually got added is just a little shy of that.

3          So, Judge, we've got from the trustee's own records

4  evidence that value was transferred, that it was valued at

5  about what the banks thought that it would be.  We ended up

6  taking the deposition of Matthew Rowan in this case, he serves

7  as a dual officer.  He worked for SunTrust Bank, he also

8  worked for SunTrust Robinson Humphrey.  He testified that at

9  the time he felt that the price being paid was reasonable.

10          When I took the plaintiff's deposition, Mr. Miller,

11  and his financial expert, Mr. Hominy, I asked them what

12  evidence do you have, what analysis do you have of what the

13  value of these assets were, because that's what's required in

14  order for the trustee to meet its burden is, you have to come

15  in and say, okay, we think you overpaid, you have to present

16  evidence of what that value is.

17          The trustee never had an expert report, never did an

18  analysis of the value of those assets, and so our argument is

19  there is no evidence in the record to contravene what we

20  believe are undisputed material facts.

21          The trustee also did not have an insolvency analysis

22  of Our Alchemy.  There is no presumption of insolvency because

23  this transaction took place almost a year before the filing of

24  the bankruptcy petition.  Without any expert testimony on

25  those two critical points, Judge, we think that ANConnect is

1  entitled to judgment as a matter of law on all of the

2  trustee's counts that go to seek to unwind the ANConnect

3  transaction.

4         And, Your Honor, if I can just, if there are any

5  questions, I mean we, we cite very strong cases about the need

6  for there to be some proof of this difference in value, that

7  there needs to be a showing that there was something in the

8  transaction that was tainted or that would suggest that it was

9  being done for some fraudulent purpose.

10        When you have outside bankers, outside accountants,

11  millions of dollars are being loaned by a bank, millions of

12  dollars are being put in by equity investors, these people

13  believe that the business plan was a reasonable one, and the

14  combined Our Alchemy with the ANC assets did not perform as

15  the way they thought it would.  But what we also see in the

16  records is that that wasn't ANC's fault.

17        And so, Your Honor, we believe that we're entitled

18  to summary, or judgment as a matter of law on the trustee's

19  counts seeking to unwind that transaction.

20        THE COURT:  Okay, thank you.

21        MR. BELLI:  Good afternoon, Your Honor, Andre Belli

22  on behalf of the trustee.  I'm here with the trustee's

23  bankruptcy counsel, John Carroll.

24        I just want start with kind of a procedural matter.

25  These exhibits that have been emailed to the Court in advance

1  of this argument, this isn't an evidentiary hearing, it's

2  argument on a motion.  And I don't think it's appropriate, I

3  don't know if Your Honor is referencing that email, but I

4  don't think it's appropriate for that reason.  And I also

5  don't think it's appropriate because the exhibits Mr.

6  Hungering has cited are all out of Docket Entry 315.

7       When ANConnect filed its motion for summary judgment

8  it didn't do what's typically done and attach a declaration,

9  here's the exhibits to our motion for summary judgment, 1, 2,

10 3, 4, 5.  What they did was they took the depositions taken in

11 the case and filed them [indiscernible].  So Exhibit 315 is

12 just a deposition from a witness in a case with all the

13 exhibits to that deposition attached to it.

14      They didn't do the hard work when they filed the

15 motion of, oh, here's the exhibits we're going to use in our

16 motion, here's the exhibit number for purposes of the motion.

17 They just attached the deposition and all the exhibits.  And

18 then at the 11th hour, they come in and they take, what

19 they're presenting to you isn't the entirety of the exhibits,

20 they're exerting the exhibits, they're leaving essential pages

21 out of the exhibits, they're adding highlighting to the

22 exhibits, and I don't think it's appropriate.

23      So that being said, I'll move on to the substance of

24 my argument.  I strenuously disagree that the trustee doesn't

25 present evidence that creates material issues and disputed

1    fact on all the elements of its fraudulent transfer claims.

2         The issues pertaining to the fraudulent transfer are

3    inherently fact sensitive, and the trustee presents ample

4    evidence which dictates that the motion should be denied.

5         I'll start where Mr. Hungering started with the

6    absence of an expert.  There's not a single case.  Mr.

7    Hungering doesn't cite one.  I looked, I couldn't find one.

8    Nothing in the brief cites that says an expert is required to

9    make out a fraudulent transfer claim.  There's no case that

10   says you need an expert for reasonably equivalent value.

11   There's no case that says you need an expert for the other

12   piece of the fraudulent transfer analysis.  There's not a

13   single case that says that. What the cases do say is that the

14   trustee is accorded considerable latitude in the kind of

15   evidence it presents to the court to try to prove the elements

16   of its claim.

17        And let's look at the evidence starting with the

18   lack of reasonably equivalent value.  Alchemy paid a purchase

19   price of just over $37 million for ANConnect and Anderson

20   Digitals Video Assets.  This doesn't include assumed

21   liabilities which themselves were significant and added tens

22   of millions of dollars additional to that purchase price.

23        Of the 37.6 million cash purchase price, over 35.8

24   million of that was allocated to the physical segment of the

25   business.  How did the parties arrive at that number?  Well,

1  back in February 2015 before any due diligence had occurred,

2  they said okay, we're going to base the price for the physical

3  business based on four times the estimated pro forma EBITDA of

4  that business.  That's the metric they agreed to prior to due

5  diligence.

6          So let's start at a high level.  What evidence do

7  you have that makes this price unreasonable?  Well, first of

8  all, you've got them hang a 4X premium on EBITDA.  And they're

9  doing that in a market for physical media generally which

10 constituted the vast vast majority of the purchase price which

11 was tanking.  Physical media is a dinosaur.  You can't even

12 find physical media anymore.

13         Industry revenues for physical media declined for

14 from 20.6 billion in 2006 to only 9 billion in 2015 with

15 declines expected to accelerate rapidly through 2021.  So for

16 this reason, when ANConnect was considering buying equivalent

17 assets from Alchemy just four years before this transaction

18 when the physical business was much better, they said, hey,

19 even a 2X multiple EBITDA would be way too high.  And that's

20 in Exhibit 31 to the trustee's opposition.

21         So right off the bat, you have Alchemy paying more

22 than two times more for the business than ANConnect considered

23 reasonable at a time when the business was much more

24 favorable.  So that's the industry generally.

25         Let's look at ANConnect's video business in

particular.  That business was on the verge of collapse, yet
ANConnect senior personnel acknowledging in January of 15,
seven months before the sale that losses on the physical side
of the business were mounting and that its video business as a
while was not generating the cash flow it needed to survive.
That's Exhibit 28.

You had ANConnect executives, they knew that
ANConnect only had one profitable account, that it was facing
losses on contracts that it would take years to recoup, and
they describe its video business as causing its time and
resources to be wasted.  That's Exhibit 29.

You had ANConnect misrepresenting the state of its
business to Alchemy during the due diligence, informing
Alchemy that, and this is a quote, "bad debt writeoffs were
infrequent and insignificant."  That's in Exhibit 32 at page
16.

But its principals knew that the business was a
ticking time bomb facing significant bad debt write offs.
There's an email prior to the sale where Anderson CFO
described its video business as immediately and forever upside
down across the majority of its accounts.  That's in Exhibit
33.

And then immediately after the sale closed, two
weeks after the sale closed, ANConnect wrote off $12 million
in bad debt.  And you'll see that in Exhibit 34.  So during

1   due diligence they're paying, they're telling Alchemy, oh,

2   this company doesn't have bad debt.  Bad debt, debt writeoffs

3   are infrequent and insignificant.  Transaction closes two

4   weeks later, they're writing off 12 million in bad debt.

5           So at the same time they're trying to get Alchemy to

6   pay a premium for their business, they're lying to them about

7   the bad debt.

8           Additionally, Alchemy personnel knew that ANConnect

9   had very concerning issues collecting its account receivable.

10  That's established in Exhibit 21.  And it establishes that

11  ANConnect was past due on tens of millions of dollars due to

12  Alchemy alone.  You had ANConnect's balance sheets that showed

13  numerous suppliers with negative net balances and negative

14  payables balances.  That's Exhibit 26.

15          So at a high level, you have the evidence showing

16  that Anderson was selling a dying husk of a business, and the

17  fact finders entitled to consider this evidence in deciding

18  that a purchase multiple of four times EBITDA was far in

19  excess of reasonably equivalent value.  So that's kind of the

20  multiplier of the high level piece.

21          The other piece that went to determine the purchase

22  price was the estimated pro forma EBITDA.  So let's dive down

23  into that EBITDA.  We've got a multiple that's bad.  Is the

24  EBITDA bad too?  And I submit that the EBITDA was bad.  So the

25  EBITDA that they use to determine the purchase price, it was

1  bad for three major ANConnect suppliers and should have been
2  adjusted downward to account for that, but it wasn't.  The
3  first supplier, the first supplier we describe in the brief is
4  Group 1200, ANConnect's third largest supplier.

5          Alchemy knew that the relationship with Group 1200
6  was going to terminate immediately following the purchase and
7  it would have a negative EBITDA impact of $1.4 million.  So
8  not only is Group 1200 leaving reducing EBITDA by $1.4
9  million, Alchemy is not getting them as a customer.  But at
10  the Same time, Alchemy is inheriting liabilities associated
11  with the Group 1200 relationship to the tune of over $3
12  million.

13          So right off the bat with Group 1200, you have what
14  should be an $8.6 million reduction to the purchase price, 1.4
15  EBITDA times 4, plus the $3 million in assumed liabilities.

16          Moving to the second component of how the trustee
17  demonstrates the EBITDA was overinflated, you have ARC.  ARC
18  was identified before the sale as a critical component of the
19  deal value.  ANConnect recognized it and stated internally
20  that Alchemy really needed comfort about this ARC relationship
21  because it represents 25 percent of ANConnect's EBITDA.  25
22  percent of the EBITDA.  And thus 25 percent of the purchase
23  price.  And the ANConnect EBITDA recognizing that is in
24  Exhibit 41.

25          Did due diligence give Alchemy any comfort about the

1   ARC relationship?  No, not at all.  It did the opposite.  What

2   did they find during due diligence?  ARC is insolvent.  ARC is

3   not a going concern.  That's 25 percent of your EBITDA right

4   there.  There's many exhibits cited establishing those facts

5   and Alchemy's awareness of it.

6          So what does Alchemy do after it discovers that the

7   customer responsible for 25 percent of its purchase price is

8   not a going concern, is insolvent?  It doesn't do anything.

9   It doesn't stop the transaction, it doesn't negotiate the

10  purchase price down, it just pays full freight.

11         And the trustee cites in an email, Exhibit 49, where

12  senior executives are begging Alchemy's CEO to negotiate the

13  price down.  Doesn't make any sense to pay for EBITDA

14  attributable to a supplier that's going out of business.  Even

15  ANConnect was shocked that Alchemy didn't request a reduction

16  of the purchase price.  So, and that's in Exhibit 50.  So with

17  ARC, we thought the purchase price should have been lowered by

18  an additional 25 percent.

19         And then the final component would be what the

20  trustee addresses in its brief is its relationship with Dream

21  Works, also known as Classic.  Dream Works accounted for $4

22  million approximately as video revenue.  In the contract

23  between ANConnect and Dream Works there were minimum

24  guarantees.  Meaning that regardless of performance, ANConnect

25  was obligated to pay Dream Works a minimum amount.  In the two

1  years prior to the transaction, ANConnect failed to meet the

2  minimum guarantee, and ANConnect owed substantial penalties to

3  Dream Works with internal emails ANConnect noting that it

4  would take them years, at least three years to recoup

5  ANConnect's losses.  And that's in Exhibit 29.

6          So you've got, you've got Dream Works' relationship

7  which accounted for positive EBITDA in the purchase price, but

8  that wasn't making any money for ANConnect, it was costing

9  them money because of the poor contract that ANConnect agreed

10 to.

11         Prior to the sale, ANConnect and Dream Works agreed

12 that in light of the failing nature of the physical media

13 business and the fact that this contract, you know, it's

14 basically untenable for ANConnect that the minimum guarantee

15 should be eliminated from future contracts and that in the

16 current contract, ANConnect would get an increased

17 distribution fee up to 26 percent for 18.5 percent.  That's

18 established in Exhibit 53.

19         So what happens when Alchemy takes over the Dream

20 Works relationship that even as modified is leaving ANConnect

21 in the hole?  Alchemy takes over the relationship and the

22 distribution fee goes back down to 18.5 percent.

23 Additionally, Dream Works charged a $1.5 million consent fee

24 to agree to the transaction.  And in exchange for these

25 concessions with Dream Works making it a more unfavorable

1  relationship than even ANConnect had, and even ANConnect

2  couldn't make profitable, all they got was six months of

3  guaranteed business at which time Dream Works was free to

4  terminate the relationship.  And that's what happened.  Dream

5  Works terminated the relationship after the six months because

6  Alchemy couldn't meet the minimum guarantees just like

7  ANConnect.

8        So you've got another major trunk of EBITDA that

9  increased the purchase price, yet provided no value whatsoever

10  for Alchemy.  All of this evidence the trustee submits creates

11  a genuine dispute of material fact as to the issue of

12  reasonably equivalent value and requires that the motion be

13  denied.

14        So Mr. Hungering presented Your Honor with two

15  exhibits that purport to show that ANConnect assets performed

16  as expected.  And one of those exhibits is, they call it

17  Exhibit 7 in the submission they made this morning to Your

18  Honor, and it's a 2016 confidential information memorandum

19  that Alchemy was using in April 2016 to attempt to kind of

20  recapitalize its business.  Alchemy was on the verge of

21  collapse in the wake of this ANConnect action.  They were

22  attempting to bring additional cash to the business.  So this

23  is Alchemy's selling, trying to sell other lenders on putting

24  more cash into its business saving its business.

25        And the figure Mr. Hungering points you to is on

page 6 of his presentation.  The version of the presentation

Mr. Hungering provided the Court is, you know, not the entire

presentation it jumps right from the first page to page 6.

And what this, what Mr. Hungering says this represents is that

Alchemy and ANConnect combined in 2015 had a positive EBITDA

to the tune of just over $6 million.

Well, let's think about that for a second, Your

Honor.  The ANConnect transaction didn't close until July

2015.  July 2015, you know, there was no combined Alchemy and

ANConnect in 2015 in other words.  ANConnect and Alchemy were

only combined for half of 2015.  So this figure which Mr.

Hungering says oh, you take the negative two for 2015 for

Alchemy alone, and you, you know, extrapolate out to the

positive six that's presenting for Alchemy and ANConnect in

2015.  That means that ANConnect's assets had to produce eight

and a half million dollars of EBITDA in 2015 which Mr.

Hungering claims is what the bank was projecting they were

going to represent.

Well, if you think about this, they just carried

forward for the purpose of selling Alchemy's business to the

banks, they carried forward the $8.5 million EBITDA estimate

and presented it as a combined business for 2015 because if

you're going to believe Mr. Hungering, the assets performed

twice as well as expected because Alchemy and ANConnect were

only combined for half of 2015, not even half of 2015.

1          So I submit that these numbers are basically fiction

2    that Alchemy was using to try to save its business.  And how

3    do we know that it's a fiction?

4          Well, if I may hand up the entire presentation, Your

5    Honor, instead of, you know, these two or three pages.

6          THE COURT:  Given that they just sent it to me this

7    morning, yes, you can send it up to me.  Thank you.

8          MR. BELLI:  So the first few pages are covered in

9    disclaimers, Alchemy doesn't represent or warrant any of the

10   numbers presented in this presentation.  You jump to page 6 of

11   the presentation, Your Honor, which is the page Mr. Hungering

12   purports to show, purports shows that ANConnect assets

13   performed as expected.

14         If you flip back two pages to page number 4, there's

15   a slide giving executive summary describing recent events

16   concerning the ANConnect transaction.  The second bullet point

17   down says, "The ANConnect transaction presented a number of

18   integration and operational challenges for Alchemy post-

19   closing."  Sub-bullets are describing those integration and

20   operational challenges.  You know, and to summarize, they're

21   basically related to ANConnect's implementation of an SAP

22   business management platform that was a total debacle and left

23   Alchemy unable to determine what was going on with the assets

24   they purchased.  And the effect of it is summarized in the

25   last bullet point on that page.  The disruption caused by

1    Anderson's SAP implementation during the transition period
2    have material adverse consequences to the operation, to the
3    operating and financial condition of ANConnect/Alchemy in the
4    second half of 2015, which of course was the only time in 2015
5    that the ANConnect and Alchemy assets were combined.

6           If Your Honor goes to the next page, it says
7    "Anderson's SAP implementation during the ANConnect
8    transaction period materially adversely impacted the liquidity
9    and financial performance of the consolidated Alchemy
10   business, and that Alchemy was determining its best recourse
11   against Anderson for effective value destruction during the
12   ANConnect transaction."

13          So that's what this presentation says in the two
14   pages preceding this chart where you know the ANConnect assets
15   magically perform at $8.5 million EBITDA which was the same as
16   what the bank projected them to perform.  They show that.
17   That number is a complete fiction.

18          And in addition to the fact there's presenting in
19   the slide that said that during the second half of 2015
20   ANConnect assets were a complete disaster.  You have the fact
21   that ANConnect was holding on to $6 million of Alchemy's A/R.
22   There's no dispute as to that fact.  They admit that they were
23   supposed to hold on to Alchemy's A/R and readmit it to
24   Alchemy.  But they just didn't.  And they said why they
25   didn't.  They said they wanted leverage over Alchemy.

1           So you're going to tell me that the ANConnect assets

2   performed as expected when they were not even given the

3   revenue Alchemy's assets are generated back to Alchemy.   It's

4   a nonsensical claim, Your Honor.

5           I think that the evidence I've described along with

6   kind of paucity of evidence presented by ANConnect

7   demonstrates that the trustee has presented evidence which

8   should allow its, the element of reasonably disputed value to

9   proceed to trial, which brings us back to the next element of

10  a constructive fraudulent transfer claim.

11          And there's three ways the trustee can satisfy the

12  requirements which are set forth in section 548(a)(1)(b)(2).

13  You can have an insolvent, a company that's insolvent at the

14  time of the transaction or rendered insolvent by the

15  transaction.   You can have a business that's inadequately

16  capitalized, or you can have a business or at this juncture,

17  you can have any one of the three, you can have the intent to

18  incur or the belief that the debtor would incur debts beyond

19  the debtor's ability to pay as those debts mature.

20          In ANConnect's brief, if you read it, it effectively

21  concedes that the trustee can meet this burden when it

22  acknowledges the grave financial distress experienced by

23  Alchemy in the wake of the transaction.   Their own brief at

24  page 6 attempts to argue that this financial distress wasn't

25  ANConnect's fault, but they don't dispute that it happened.

1   And the trustee presents ample evidence that Alchemy wasn't
2   able to pay, timely pay its debts both before the ANConnect
3   transaction and after the ANConnect transaction.

4           If you look at pages 1 to 3 of the trustee's
5   principal brief, there's numerous pieces of evidence cited
6   that establish a multitude of payment defaults made by Alchemy
7   before the transaction, that before the transaction Alchemy
8   was intentionally withholding payment from its vendors because
9   it didn't have the ability to pay.  You had Alchemy employees
10  before the transaction banding about their fears of going to
11  debtors' prison because of the way they were operating the
12  business.  And you had the company's general counsel
13  explicitly instructing Alchemy employees to butter up favored
14  vendors so that the company could get a positive Dun &
15  Bradstreet rating.  This is before the transaction.  Alchemy
16  is not meeting its debts as they come due before it pays $37
17  million for the ANConnect assets.

18          Let's go to after the transaction.  Well, things got
19  much worse as described in detail and recites to numerous
20  pieces of evidence on pages 12 to 16 of the trustee's brief.
21  You have vendors literally begging Alchemy for payment.  And
22  you had Steven Lyons who was an employee of Anderson Visual
23  that came over to Alchemy as part of the transaction, well, in
24  early 2016 after you know just about six or seven months afer
25  the transaction closed, he sued Alchemy because he didn't get

1   paid what he was supposed to in connection with the deal.  He

2   signed a declaration that described the transaction as an

3   operational and financial disaster which left Alchemy

4   experiencing serious trouble meeting its financial obligations

5   as they come due and detailing a multitude of payment defaults

6   that Alchemy was, payments that Alchemy had defaulted on in

7   the wake of the transaction.

8          So I submit, Your Honor, that this, you know, this

9   one statement in and of itself is enough to meet the trustee's

10  burden to go to the fact finder.  And that's before you

11  consider all of the other evidence of you know illiquidity,

12  inadequate capitalization, inability to pay debts, you know,

13  both before and after this transaction.

14         These issues, reasonably equivalent value, the other

15  elements of the fraudulent transfer claim, they're inherently

16  fact sensitive, considerable latitude according to the fact

17  finder.  And some, you know, argument that having an expert is

18  an element of the claim, it's just not correct, Your Honor.

19         And if Your Honor doesn't have questions, that's --

20         THE COURT:  Thank you.

21         MR. HUNGERING:  Very briefly on reply, Judge.

22         THE COURT:  Yes, go ahead.

23         MR. HUNGERING:  Your Honor, very briefly.  The

24  exhibits that were included were in a deposition, so they were

25  already authenticated by those witnesses and explained by

1  those witnesses.

2         What the trustee has not done, we're not here on a

3  motion to dismiss where you can just point to documents and

4  have a general theory, it is the trustee's time to shut up or

5  show up and tell us what you've got.  And he can't do that.

6  And to the point about --

7         THE COURT:  He just referred to a whole bunch of

8  documents.

9         MR. HUNGERING:  None of which have been explained.

10  There were no depositions taken by the trustee other than the

11  30(b)(6) of ANConnect and Amerge (phonetic) and those related

12  solely to the issues that are part of their motion for summary

13  judgment.

14         THE COURT:  That doesn't mean they're not going to

15  call a witness at trial.  They can get those documents in.

16         MR. HUNGERING:  Well, and I wanted to put out a

17  couple of cases.  The other thing I would point Your Honor to

18  is a law review article you wrote in the spring of 2012 where

19  you said that in a sufficiently complex, in certain

20  bankruptcies that are sufficiently complex as to almost

21  certainly required that the valuation be reformed by an expert

22  in the field, which is what we have here.

23         And so the two cases that are cited in our brief

24  that I'll point to the Court to, the LaSalle National Bank vs.

25  Pearlman, that was a summary judgment, and the trustee said,

1   we plan to bring an expert at trial.  And the court said,

2   that's not good enough.  When someone has filed a motion for

3   summary judgment saying there is a lack of evidence, you must

4   come in with admissible evidence at this stage.

5          It would not also be appropriate for them to now

6   bring an expert at trial because they never disclosed an

7   expert and they never issued a Rule 26 report.

8          Some of the documents that the trustee has sort of

9   pointed to are business records either from ANConnect or from

10  other parties that have not been explained by anyone.  I mean

11  you can certainly look at them, they might be admissible as an

12  admission of a party, but they're not explained.  And that's

13  what we would expect to have a financial expert come in and

14  present.  I'm trying to think how does this get presented to a

15  jury because the trustee is insisting on having a jury trial.

16         The other case I would point the Court to is the

17  liquidation trust of Hechinger.  Both of these two cases are

18  U.S. District of Delaware.  And in this one, it was another

19  motion for summary judgment similar to ours, reasonably

20  equivalent value, and the defendants were saying there's no

21  evidence to show that it wasn't reasonable.  And the trustee

22  there did the same thing.  Well, we don't believe the numbers.

23         If you don't like the confidential information

24  memorandum which is a document that belongs to the trustee now

25  who stands and eschews about Alchemy, there's also the

1  SunTrust downgrade memo which was, it was part of the Rowen

2  deposition in which is a matter of the record.  That was

3  issued in January of 2016 where the bank is saying that the

4  ANConnect assets were performing on par with what we were

5  projecting.  And so it is their time to come in with evidence.

6          What we're pointing to is both a lack of evidence as

7  well as sworn testimony of the bank's representatives, the

8  trustee's own documents, and we think this is a case that you

9  just can't come in with a theory, that you have to come in

10 with actual proof to create a genuine issue of material.

11         THE COURT:  Well, they have to come forward with

12 evidence that would be admissible at trial at summary

13 judgment, but it doesn't have to be in an admissible form at

14 this point.  So if they have business records that they can

15 get in under the business record exception, where does it say

16 I need someone to explain what those records mean?  I can look

17 at those records and interpret them.  And you can argue at

18 trial that they're not what they mean.  You can argue your

19 position, they'll argue their position.  But it doesn't mean

20 it's not an admissible document.

21         MR. HUNGERING:  I agree with Your Honor.  I would

22 say that they haven't even done it to, because the only

23 authenticating that's happened is counsel has said that these

24 documents came, but there is no, there has not been a witness

25 who says, I can explain that document, I wrote that document.

1          THE COURT:  They don't need to do that at this
2    stage.  They can say we'll bring a witness at trial.  If they
3    can't, the document doesn't come in.
4          MR. HUNGERING:  Right.  So, well, Judge, there were
5    also a few other documents that we objected to on grounds that
6    you know they attached an arbitration award that's
7    inadmissible, that's hearsay and we cited some cases on it.
8    We also have objected to Mr.  Hominy coming in and having
9    these opinions, much of which counsel argued today which is we
10   don't believe the financial records, and here's an email
11   suggesting that they were having some trouble.
12         When I deposed Matthew Rowen from SunTrust, I asked
13   him the question, "Was there any concern that the bank had
14   that Our Alchemy was either insolvent at the time of the
15   transaction or would be rendered insolvent?  And his testimony
16   was no.  In fact, we, they perceived the combined Our Alchemy
17   to be a better credit risk for the bank.  And that's why all
18   those banks put the money in.
19         THE COURT:  That's an issue of fact for trial.  And
20   I might disagree with them, well the jury might if we're going
21   to have a jury trial.
22         MR. HUNGERING:  They've asked for a jury trial, Your
23   Honor.
24         THE COURT:  Right.  Jury could find, then they'll
25   find the witness credible.

1          MR. HUNGERING:  Correct.  Absolutely.

2          THE COURT:  So in my view, it looks like we have

3  material issues of fact that are, I can't decide on a motion

4  for summary judgment.

5          MR. HUNGERING:  What I would say is undisputed is

6  you had all of these commercial advisors, banks, all of these

7  other parties.  If this was truly a fraudulent conveyance, who

8  in their right mind, what bank, or what equity fund is putting

9  money into a deal that they think is going to fail within a

10  year.  Everyone went into this with the belief that this was a

11  reasonable business model.  And the cases that we cite in our

12  brief suggests that when you have those aspects of a deal,

13  this was not some insider, hey will you buy this, it was,

14  there were sophisticated professionals.  And that's why the

15  case that, I wish I had it at the top of my hands.

16          THE COURT:  But those are conclusions that you can

17  argue to a trier of fact, but they aren't the facts.  The

18  facts are what the facts are.  And you can then argue based on

19  the fact that I have these banks that have all done their due

20  diligence and determined this was a good deal, that you know,

21  ladies and gentlemen of the jury, you should find in my favor

22  because no reasonable bank would have done that.  But that

23  doesn't alter the fact that my job at this point is just to

24  decide are there facts that could be admissible at trial, that

25  could be presented to the jury who can then make that

1  determination.

2        But you're asking me to decide based on your

3  arguments about what those facts show.  And that's not summary

4  judgment.

5        MR. HUNGERING:  Well, and we think the absence of

6  the trustee coming in with admissible evidence, and even if

7  they can say it's a maybe a dispute on insolvency, I have not

8  heard, so how much do you think this ANConnect assets are

9  worth?  And that's really where an expert would come in and

10 say because there's no doubt there was some value that was

11 given.  They went out and sold video product and got paid,

12 they got banks to lend on the concept of this business model.

13 What are they going to argue or show to the jury that you

14 overpaid by 5 million, 10 million?  We haven't seen that.

15       Thank you, Judge.

16       THE COURT:  Thank you.

17       Well, I'll take this one under advisement then.

18 I'll either issue a bench ruling or a written ruling in due

19 course.

20       MR. BELLI:  Your Honor, this is the second of three

21 motions.  So the first motion we just addressed was kind of

22 about the main claim in the 2018 adversary, the claim to avoid

23 the ANConnect transaction as a whole.

24       The trustee has filed a motion for partial summary

25 judgment on kind of some ancillary claims, they are claims

1  that aren't part of that larger fraudulent transfer claim.

2          THE COURT:  Before we go any further, let me ask

3  kind of an overall question here.  Where does the superior

4  Court case stand?  I know it's stayed at this point.

5          MR. BELLI:  It's stayed.  It got stayed I believe

6  either before or very shortly after discovery started.  And

7  it's remaining stayed.

8          THE COURT:  Well are the issues in that case the

9  same as the issues in this case or do they overlap in some

10 way?

11         MR. BELLI:  There are some overlapping issues.  For

12 example, that case Alchemy filed a counterclaim seeking return

13 of its 6 million in A/R.  So there are overlapping issues.

14 But the trustee is approaching it --

15         THE COURT:  So how do we deal with that?  I mean can

16 we, why can't I just lift the stay and let the Superior Court

17 case go forward?

18         MR. BELLI:  I don't know, Your Honor.  And honestly,

19 I haven't really considered it.  I haven't, you know, taken a

20 close look at that issue.  I would think that the issues

21 presented to Your Honor are fairly bankruptcy specific, and I

22 don't see why Your Honor couldn't resolve them.  I think Your

23 Honor is in a better position to resolve them and that makes

24 the most the kind of economic sense.

25         THE COURT:  But you asked for jury trial, so it's

1  going to be over in District Court anyway, in front of a jury,

2  right?

3       MR. BELLI:  Well, yeah.  By Your Honor, I guess an

4  euphemism I guess for the whole process over here in

5  Bankruptcy Court and District Court, yes.

6       THE COURT:  I guess that's what I'm trying to figure

7  out for purposes of judicial economy.  I think I need to know

8  what's at issue in that Superior Court case, whether or not I

9  can just lift the stay and allow that to go forward which

10 would resolve some of the issues here and you'd get your jury

11 trial.  And it would resolve my having to decide motion for

12 summary judgment on those same issues, and at the same time

13 relieve the District Court of having to hold a jury trial on

14 an issue that can be resolved at the state court level.

15      MR. HUNGERING:  I mean it's a fair point, Your

16 Honor.  It's not one honestly I'm not prepared to address

17 today.  I will note that this case is much, much further along

18 in terms of discovery.  Discovery is done in this case;

19 whereas the discovery either hasn't started or would have, you

20 know, been ongoing for a month or two at the most in the other

21 case.  So that might open up a whole can of worms.

22      THE COURT:  It would be the same discovery though,

23 wouldn't it?

24      MR. BELLI:  To some extent.  But there are issues in

25 the state case which go beyond, you know, are different in how

1  they're presented at least.

2          THE COURT:  Well I'm going to have to, I've got a

3  handle on that issue, so I'd like the parties to let me know

4  can I, what do I do with that Superior Court case?  Do I let

5  it go forward, do I keep it stayed?  Do we decide those issues

6  here?  Do we let it go forward in the Superior Court?

7          MR. BELLI:  Your Honor, would you be okay with kind

8  of a supplemental submission?

9          THE COURT:  Yes, yes.

10          MR. HUNGERING:  Yes, we'd be happy --

11          THE COURT:  You can confer and come up with a

12  schedule.

13          MR. HUNGERING:  Thank you, judge.

14          MR. BELLI:  So that brings us to the trustee's

15  motion for partial summary judgment.  The trustee is seeking

16  summary judgment on two claims.  The first is a preferential

17  transfer claim arising out of the improper setoff of just over

18  $3.2 million due to Alchemy buying ANConnect to satisfy an

19  antecedent debt owed by Alchemy Anderson Merchandisers.

20          Some factual background.  Just in connection with

21  the asset purchase agreement, the parties kind of entered into

22  agreements which would govern their relationship going

23  forward.  One of those agreements was between Alchemy and

24  Anderson Merchandisers, the merchandising agreement where

25  Alchemy engaged Anderson Merchandisers to perform various

1  services at Walmart stores.

2        And, Your Honor, it's undisputed that the $3.3

3  million owed by Alchemy, owed to Alchemy by ANConnect was

4  improperly set off to satisfy any antecedent debt owed to

5  Alchemy, owed by Alchemy to Anderson Merchandisers.

6        And how do we know that?  Well, we can look at

7  Anderson's own filings with this court.  On July 22nd, 2016,

8  Anderson filed a motion for stay relief.  It's attached as

9  Exhibit I to the trustee's motion.  It's Docket No. 42 in the

10  main bankruptcy case.

11        And in that motion for stay relief, they frankly

12  inform the Court, as of the petition date, the debtor owed

13  Anderson Merchandisers $193,846.54 under the merchandising

14  agreement, none of which has been paid.  This number is net of

15  a 3,208,314 setoff exercise by the debtor on April 12, 2016.

16  So right there, Your Honor, you have a judicial admission that

17  this setoff occurred and it was a setoff exercised by the

18  debtor.

19        Given this judicial admission, the facts about the

20  setoff can reasonably be disputed which brings us to why the

21  setoff is improper and should be avoided as a preference.  The

22  caselaw cited in the trustee's brief establishes that when a

23  party asserts a prepetition setoff as a defensible preference

24  action, the court must first determine whether the setoff is

25  valid under section 553 of the setoff provision and the court

1  applies the preference provisions, section 547, if it finds
2  that the setoff was invalid.

3        The setoff here was invalid because it was a
4  triangular setoff.  Section 553 only protects the setoff of
5  mutual debts which are owing between two parties, and setoffs
6  like the one at issue here were debt owed by ANConnect to
7  Alchemy was used to offset amounts owed by Alchemy to Anderson
8  Merchandisers were described as triangular setoffs and are not
9  protected in bankruptcy.  And the Third Circuit has clearly
10 ruled on that as, in the [indiscernible] case.  And there's
11 other cases on the same points cited in the brief.

12       Instead, it's well established that these transfers
13 are avoidable as preferences.  That's the trustee's claim in a
14 nutshell.  Anderson doesn't really raise a dispute as to the
15 other elements of the preference claim, they just dispute that
16 the setoff occurred in the first instance.

17       Anderson attempts to introduce evidence of an
18 indemnity agreement.  And they say, oh no, you know despite
19 what we told the court, this wasn't a setoff of amounts that
20 were owed to Alchemy against the amounts owed to Anderson
21 Merchandisers.  They said this was an indemnity agreement
22 where ANConnect agreed to indemnify Anderson Merchandisers.

23       Well, it contradicts the filing with this Court,
24 Your Honor.  It contradicts their statement to this Court that
25 it was a setoff.  The argument is also, you know, seems to be

1  fabricated out of whole cloth.  They haven't presented a
2  written indemnity agreement.  Mr. Myer was unable to testify
3  to the essential terms of an oral indemnity agreement during
4  his deposition.  He doesn't, they can't meet the essential
5  elements to establish an oral indemnity contract.
6          And it's also contradicted by the fact that Anderson
7  Merchandisers filed a $2.4 million claim in this court.  So
8  you know after the trustee brings a claim to avoid this
9  transfer, they say oh no, it wasn't a setoff, it was an
10 indemnity agreement.  Well, that's not what they told this
11 Court before.  They told this Court it was a setoff before.
12         You know, why are they filing a $2.4 million claim
13 if there's an indemnity agreement?  The indemnity agreement is
14 a fiction and there's not evidence that it existed.  And even
15 if there were, they shouldn't be allowed to contradict the
16 statements they made to this Court in support of relief from
17 the stay motion which relief the Court granted based on the
18 content of those representations.
19         THE COURT:  Are you asking me to apply judicial
20 estoppel?
21         MR. BELLI:  I guess, Your Honor.  I think that's
22 appropriate here.  They --
23         THE COURT:  Well, with judicial estoppel you've got
24 to show me that you changed your position on something and
25 were harmed as a result of that, as opposed to they made these

1  representations in their pleadings, which is a statement

2  against interest which is admissible evidence to show that you

3  know they're not telling the truth when they get to trial.

4  But it's not, that in and of itself isn't enough to say I can

5  apply judicial estoppel and say they're prevented from now

6  arguing contrary to what they put in their pleadings

7  previously.

8         MR. BELLI:  Well, so in the case law, the trustee

9  cites the change in position, the equivalent to that is

10  they're seeking relief from the Court and the Court grants the

11  relief.  That's the, you know, the Court changed its position

12  from the default being the automatic stay to relief from the

13  stay being granted in response to the representation.

14         THE COURT:  All right.

15         MR. BELLI:  So that's, that's the first claim the

16  trustee is seeking summary injunction on.  That's the

17  preferential transfer claim.

18         The second claim the trustee is seeking summary

19  judgment on is the turnover claim arising out of ANConnect's

20  admitted withholding of just over $6 million of Alchemy's

21  accounts receivable which ANConnect collected on behalf of

22  Alchemy, yet failed to remit to it.

23         So that's, this is, the trustee's motion in

24  resolving this claim in this litigation is basically a matter

25  of contractual interpretation for Your Honor.  The July 9th,

1  2015 transitions services agreement, in that agreement,

2  ANConnect agreed to perform various services for Alchemy.  The

3  agreement as a whole is attached as Exhibit B to the trustee's

4  motion.  And Exhibit B to that agreement lists the services

5  which ANConnect agreed to provide for Alchemy.

6       Those services included the collection of Alchemy's

7  accounts receivable from Alchemy's customers.  Exhibit B, the

8  exquisite language used is that ANConnect is collecting

9  receivables "on behalf of Alchemy."  On behalf of, Your Honor.

10  So ANConnect's only argument in counter to the trustee's

11  motion is that, oh no, these, we weren't collecting Alchemy's

12  receivables, this is just kind of a contractual liability that

13  you know that we can just hold off on because Alchemy wasn't

14  performing its part of the agreement either.

15       That's not the case, Your Honor.  The plain language

16  of this agreement, on behalf of, clearly indicates the parties

17  intent that the accounts receivable being collected remain

18  Alchemy's property.

19       I don't have much more to say on that claim than

20  that.  It's, you know, no one is disputing that they're

21  withholding receivables in this amount.  In emails that are

22  attached to the trustee's motion they say, oh they're doing it

23  to maintain leverage over the debtor.  Well, they're not

24  allowed to do that under the terms of the transition services

25  agreement which says that those accounts receivable are the

1  property of Alchemy.  And if they're not the property of

2  Alchemy, then what did Alchemy purchase in the ANConnect

3  transaction?

4          In the wake of the transaction, ANConnect is

5  managing all those assets for Alchemy.  The whole point of the

6  assets is that they have cash flow, they produce accounts

7  receivable.  ANConnect is managing the assets which were

8  purportedly sold to Alchemy for nearly 40 million, but it's

9  not giving Alchemy the accounts receivable that no one is

10 going to dispute it didn't belong to Alchemy.

11         So that's the trustee's second claim.  It's a fairly

12 simple motion compared to the other ones, Your Honor.

13         THE COURT:  Okay.  Thank you.

14         MR. HUNGERING:  Your Honor, I have another timeline

15 if Your Honor would like.

16         THE COURT:  Was this, was it in the exhibits that

17 you sent over?

18         MR. HUNGERING:  It's Exhibit A.

19         THE COURT:  Exhibit A.  Yes, I have it.

20         MR. HUNGERING:  Are you able to access that, Judge?

21         THE COURT:  Yeah.

22         MR. HUNGERING:  I'll start from where counsel

23 doesn't finish which is what did Alchemy purchase.  Alchemy

24 didn't finish paying for these assets.  That's why this is,

25 these parties have the dispute that they have today.  And if

1   we step back for a second, Judge, this was a pretty

2   complicated transaction where you had purchase of assets with

3   transition services being provided with merchandising services

4   being provided.  And there was supposed to be a post-closing

5   adjustment process where there were three or four balance

6   sheet items that had to get resolved.  And at the same time,

7   ANConnect was providing transition services and Anderson

8   Merchandising was providing merchandising services.  And they

9   were supposed to be paid a fee.

10          So as the closing happens and you move forward in

11  the first couple of months, there are hundreds of thousands if

12  not millions of dollars that are supposed to be paid by

13  Alchemy to the two Anderson companies for the ongoing services

14  as well as more of the purchase price.

15          And so what did the parties start doing in the fall?

16  We asked, we have the contract which the trustee both wants to

17  rescind and have a jury trial on that.  But also wants to

18  enforce portions of even though the trustee has, or Alchemy

19  never paid for those assets.

20          Your Honor, if you could take a look at exhibit, or

21  Tab 1 which is Exhibit 1.  And by the way, Judge, because of

22  the volume, we tried to just bring to Court the pages that

23  were significant.  And in this, this is an example of the

24  spreadsheet that was going back and forth between Alchemy and

25  ANConnect.  And so what you have is in the left column are the

1  amounts that ANConnect was saying, and because they're in

2  parenthesis, those were owed by Alchemy to ANConnect.

3         And then as this chart went back and forth, Alchemy

4  had its own column and you can see that, yes, there is some

5  agreement on some of these amounts including the 3.208 that

6  was not money owed specific dollars, but a credit that would

7  be part of an entire reconciliation of these post closings.

8  What else did they start to add to this chart as they went

9  back and forth?  Fees that were due to Anderson Merchandisers,

10  fees that were due to ANConnect.  And then, yes, receivables

11  that were coming in.

12         Judge, I want to speak first to the setoff claim.

13  We agree there was a setoff, but it was a setoff that

14  ANConnect applied and it was a mutual bet.  When you see these

15  charts that were going back and forth, and when you see what's

16  at Tab 2, is, I love one of the cases the trustee cites which

17  is Dunning.  And in Dunning, there is this discussion of when

18  does the setoff occur.  And the setoff occurs when the

19  decision is made to do a setoff, then when action is taken,

20  and finally when the debt is reduced.

21         ANConnect made the decision in the fall that it was

22  going to apply the collective receivables and put them towards

23  and set them off against mutual debts that were owed by Our

24  Alchemy.  And the reason that they did that is because Alchemy

25  needed them, needed both of the Anderson entities to continue

1  to provide these services.

2          And so at Tab 2, there is a letter that ANConnect

3  sent.  And ANConnect makes reference to a conversation with an

4  Alchemy executive that they were going to deduct from the

5  collected receivables to pay two different amounts that were

6  owed at the time.

7          The letter goes on to talk about other amounts owed

8  among the various contracts, what was currently due, what

9  would be due very soon.  And on the second page, the

10  concluding paragraph, ANConnect says, in order for ANConnect

11  and Anderson Merchandisers to continue to provide these

12  services, we're going to apply this 4.7 million and basically

13  this will bring the accounts current.

14          And what did Alchemy do and say?  They continued to

15  pass this spreadsheet back and forth.  Alchemy never took the

16  position, that's our property, give it to us right now.  And

17  they couldn't very well do that because these businesses were

18  trying to make this thing work.

19          And so the parties acknowledged that that was a

20  credit in favor of Alchemy but that the net amount that was

21  due to ANConnect and Amerge, was in excess of all of them.

22  And we had submitted in the record various versions of this

23  contract and other things like Exhibit 3 which is an email

24  from someone at Alchemy attaching an internal memo in which he

25  says, Alchemy owes more than ANConnect.  And he even concludes

1  the very last page, this is Document 295 at page 174, they

2  propose a net settlement of all amounts owed between the

3  parties.  And then hoping that they would negotiate a

4  settlement.

5       So we see both of the parties acknowledging this

6  right to setoff.  And we cite in our brief there was even an

7  email coming from one of Alchemy's lawyers saying yes, under

8  state law ANConnect has the right to setoff.

9       And then when did ANConnect exercise that setoff?

10  It did when it filed the action in Delaware Superior Court

11  which was in February of 2016.  ANC in its complaint, and I

12  don't have the entire complaint, because I just put the pages

13  that matter, ANConnect in laying out what their damages are

14  for their breach of contract, this is at 295 page 188, it

15  shows how much was owed under the asset purchase agreement,

16  and it's a $9 million and change.

17       And it said, "this net amount reflects an equitable

18  setoff of the 6 million in receivables.  The same Docket

19  Number 295 at page 200.  When ANConnect totaled up all of

20  their damages including under the transition services, it has

21  a footnote that the total amount is net, this net amount

22  accounts for the 3.208 million ANConnect owes Alchemy.

23       ANConnect had exercised the setoff in February of

24  2016.  Then, the lawyer from Strook in April sends a letter

25  saying you guys acknowledge that there is this credit that's

1  owed to Alchemy of 3.208 and we want you to use it as an

2  offset.

3          They don't know ANConnect and Anderson merged, don't

4  know what to do because ANConnect had already exercised the

5  setoff, and that letter, the Strook letter which is Exhibit 6

6  asks for ANConnect and Amerge to confirm that that's what

7  they're going to do.  And they never do.  ANConnect and Amerge

8  did not agree to use this as a setoff.  ANConnect had already

9  exercised the setoff so there was no credit owed in favor of

10 Alchemy.

11          And then what happens?  Well, you get into June and

12 there is as Your Honor I think pointed out, there are

13 evidentiary admissions and there are judicial admissions.  The

14 evidence that the trustee points to are evidentiary

15 admissions, but we can also come in and explain them or we can

16 point to evidence in the record which we do that contradicts

17 them.

18          What is the evidence that contradicts them?  Mr.

19 Myer when deposed was asked, what did this, what did your

20 email have to do with?  And he explained, this was an

21 indemnity payment.  Anderson Merchandiser was a separate

22 company that was off and running.  And it was agreeing to

23 provide these services for ANConnect because of that

24 transaction.  And if they weren't getting paid, we were not

25 going to allow this loss to occur, we require the sister

1  company, ANConnect, to indemnify it.

2        What other evidence is in the record that is

3  consistent with the position that Mr. Myer testified to?  And

4  that's Exhibits 9, 10 and 11.  Exhibit 9 is an email dated

5  June 23rd from Chuck, from Bill Lawry to Chuck Taylor where he

6  instructs [indiscernible] to ANConnect before June 30th

7  transfer 3.2 to indemnify Amerge from merchandising Alchemy

8  product.

9        And then Tab 8, I'm sorry, Tab 10, again all had

10  been submitted with the briefing, is a wire transfer receipt.

11  And the amount that was transferred is not 3.208, it was the

12  entire amount that was outstanding as of that date which was

13  $3,228,731.  This is at minimum a question of fact for a jury

14  to resolve.  Was this, did the setoff occur as ANConnect is

15  contending in February which is outside the preference period?

16  Can the two pieces of evidence that the trustee pointed to to

17  establish that it was a triangular setoff?  We have sworn

18  testimony, we have these records that are showing that it was

19  not.

20        And then as to the motion for relief from stay, and

21  that's at Tab 12, Your Honor, there is a footnote in which

22  Anderson Merchandisers says they state the net amount that was

23  owed, and in the footnote it shows that this number is net.

24  It's net, meaning it has been reduced in favor of the debtor.

25  So the 3.208 million had already been credited against the

1   debt owed to ANConnect which was an appropriate prepetition

2   mutual setoff under state law, and then Anderson Merchandiser

3   who had been paid by this indemnity credited the amount that

4   the debtor owed to Amerge.  What does that mean?

5          The estate has already benefitted from having this

6   amount credited to them twice.  What the trustee is asking

7   Your Honor to do would be for the estate to benefit a third

8   time by giving a judgment in favor of the estate against

9   Anderson Merchandiser.  And, Judge, we just believe that, we

10  acknowledge that there are some things in the record that

11  makes it a little you know confusing, and that's what a jury

12  trial is for.

13         As to the claim for the turnover, we can look at

14  what the parties, how did the parties treat that receivable?

15  They always treated it as this is all going to get worked out.

16  Our Alchemy always admitted that it owed more to ANConnect and

17  Anderson Merchandiser then vice versa.

18         Just two weeks before Alchemy filed its petition,

19  and we cite this in our brief and it's in the record, there

20  was an email with SunTrust counsel where Alchemy is saying

21  just two weeks before, well, we think the number we owe is

22  down to 2 million.  When I deposed Mr. Hominy I asked him at

23  the time that Alchemy asserted its counterclaims in Delaware,

24  was there ever a net amount that was owed to Alchemy.  And he

25  said no.

1          So, Your Honor, we think as to both of those

2     bankruptcy claims that they're a jury question.  I would want

3     a chance to speak to my counsel, but I think it might be a

4     good idea to just let the parties hash it out in the Delaware

5     court because there are these breach of contacts.

6          And one of the other defenses we point to in our brief is

7     you've got the trustee coming in trying to enforce as they say

8     contractual rights.  The right to that 3.2 is based on the APA

9     and the way they were going to reconcile the balance sheet.

10          We have a defense to that which is you breached

11     first.  You never finished paying for the assets you bought.

12     That's why as to the turnover claim the same waiver argument,

13     how can you claim a right to those receivables when you didn't

14     finish paying for the assets that created it?  And then the

15     trustee makes an argument too that this was almost like a

16     trust because of the language for the benefit.

17          This is not a trust case, this is not what we were

18     holding property, just holding it.  I mean those receivables

19     were product that belonged to Our Alchemy, but they were also

20     value given because ANConnect was providing warehousing,

21     shipping, packing, they were handling returns.  And those

22     receivables were payments coming from those three major

23     vendors for books, music and video.  So there was also

24     services to extract what is the amount that is for the video.

25          And for those reasons, Judge, we think it is a debt

1  as opposed to an actual property right.  And we would ask the

2  Court to deny the trustee's motion for partial summary

3  judgment.

4          THE COURT:  Thank you.

5          Mr. Belli?

6          MR. BELLI:  Your Honor, I think, you know, all this

7  evidence of, you know, there not being net funds due to

8  Alchemy and the spreadsheets about the parties settlement

9  discussions before ANConnect filed its lawsuit in February of

10 2016, I think it's all a red herring, it's all irrelevant.

11         The evidence that the trustee has presented is that

12 this setoff wasn't, the debtor instructed that the setoff be

13 performed and that ANConnect effectuated the setoff when it

14 actually transferred the money shortly before the debtor filed

15 for bankruptcy.

16         Mr. Hungering comes and says that, oh no, the debtor

17 couldn't have exercised the setoff in April 2016 because

18 ANConnect exercised the setoff when it filed its lawsuit in

19 February of 2016.  That doesn't make any sense, Your Honor,

20 filing a lawsuit and asking the Court to determine, you know,

21 to end up with a judgment of what's owed to one party.  That's

22 not exercising a setoff, you can't exercise a setoff just by

23 filing a lawsuit.

24         And that lawsuit doesn't purport to exercise a

25 setoff.  The notion of a setoff isn't mentioned until the

1  debtor sends the letter in April 2106 instructing that the

2  setoff be effectuated.  And what's another reason why the

3  state court lawsuit doesn't effectuate a setoff, doesn't have

4  ANConnect effectuate a setoff?  Well, if you look at the

5  transaction documents, ANConnect was prohibited from

6  effectuating a setoff.  Under the asset purchase agreement

7  which is Exhibit A to the trustee's motion, Section 2.06(b)(5)

8  on page 23 of that agreement says, well Anderson can't offset,

9  only the debtor can offset.

10      So if Anderson's position is that it exercised its

11 setoff, well then it's position is contrary to state law

12 because state law, under state law, the contract governs who

13 can exercise a setoff.  Alchemy could, Anderson couldn't.  And

14 if you look at the cases Your Honor cited, the same cases that

15 say that prepetition setoff is treated, can be analyzed under

16 fraudulent transfer law if it's invalid under the bankruptcy

17 code, well state law being invalid under state law gets you to

18 the same place under those cases.

19      THE COURT:  Is this an issue of law, issue of fact

20 or a mixed question of law and fact?

21      MR. BELLI:  I believe, so whether or not they

22 exercise a setoff, I think it's a mixed question and I think

23 that to the extent there's factual components, both in

24 connection to judicial admissions and the contemporaneous

25 evidence established that they exercise a setoff, Exhibit F to

1   the trustee's agreement, Mr. Myer is emailing people

2   internally at ANConnect and Anderson Merchandisers and he's

3   instructing them.  He's saying, "Please invoice ANConnect,

4   please have Anderson Merchandisers invoice ANConnect $3.2

5   million regarding merchandising services rendered to Alchemy."

6   This relates to the offset that Alchemy took being an element

7   to the post-closing adjustments to the [indiscernible].

8   Should we find the court decision that the offset was

9   inappropriate, we can later reverse it.

10          So some notion that ANConnect ever thought it was

11  exercising the offset five months before that email was sent,

12  no reasonable fact finder could accept that, Your Honor.  All

13  the evidence that's credible in the case that this was a

14  setoff exercised by Alchemy.

15          THE COURT:  Okay.

16          MR. BELLI:  And as to the other piece, Your Honor,

17  they basically, you know, they basically have no defense of

18  the trustee's argument.  The paperwork, the contract says that

19  the transfers are being made to ANConnect on behalf of

20  Alchemy.  ANConnect is collecting Alchemy's receivables which

21  Mr. Hungering acknowledged they were and that it's doing it on

22  behalf of Alchemy.  That's, you know, they don't cite cases in

23  support of their contention that oh, this isn't actually

24  Alchemy's receivables, this isn't Alchemy's property, this

25  needs to be treated like any other contractual liability.  And

1  no cases say that because the contract says it all.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Well, if this goes to jury trial, I pity the jury

5  has to go through all of this stuff to figure this out.  But

6  I'm going to take it under advisement, and I will let the

7  parties when I either issue a bench ruling as I said or submit

8  a written opinion.

9          But I do want the benefit of that, the parties'

10  positions on the Superior Court case and how that impacts this

11  case.  As I was listening to the arguments I started thinking,

12  well, these are issues of law relating to bankruptcy specific

13  issues as opposed to state law issues.  So that's something to

14  think about when you're submitting your papers.

15          The other thing I had a question about is, for both

16  parties, is anyone arguing 553(b) applies here because it

17  wasn't clear to me from the briefing?

18          MR. HUNGERING:  Thank you, Judge.  I meant to say

19  it.  The trustee has not brought a claim under 553.

20          THE COURT:  Okay.

21          MR. BELLI:  Well, Your Honor, and that's because if

22  you look at the caselaw, 553, you reference 553 in determining

23  whether a prepetition setoff is valid under bankruptcy law.

24  And if it's not, then you go to 547 and 553(b)

25  [indiscernible].

1          THE COURT:  So you're saying 553(b) applies, but

2  you're not addressing it because you just go to 547 and deal

3  with it.

4          MR. BELLI:  So 553(b) like 553(a) makes reference to

5  a mutual debt.  So 553(b) essentially provides an avenue by

6  which the Court can avoid as a preference and otherwise setoff

7  is otherwise protected by the bankruptcy code, whereas the

8  trustee seeking to avoid a preference that's not protected by

9  the bankruptcy code.

10         THE COURT:  Okay.

11         MR. HUNGERING:  I'm glad Your Honor said that.

12  There were two cases that are in our brief that kind of talk

13  about the reason Congress enacted the preference of not

14  allowing this triangular setoff was because they didn't want

15  there to be this trafficking in the purchase of obligations

16  that the debtor had that would then allow a defendant who owed

17  money to the estate to be able to, to really benefit

18  themselves.

19         And the two cases that are in our brief, there's the

20  Jones Truck Lines and the in re Flannigan Brothers.  Both of

21  those had to do with a defendant who paid a debt of the estate

22  in instances of where there's like a guarantee or a general

23  contractor having to pay subcontractors.  And then the party

24  who paid the debts of the estate did get the setoff.  And the

25  reason was they weren't trying to get some better position

1    they would have had in bankruptcy, and that's why the point

2    that I made which is ANConnect applied this credit and

3    Anderson Merchandisers did.  So if Your Honor were to rule in

4    favor of trustee, they would be paying this amount a third

5    time.

6              THE COURT:  Okay.  Anything else then before we

7    adjourn?

8              MR. HUNGERING:  We have one more motion.

9              THE COURT:  That's right, yes.  Go ahead, sorry.

10             MR. HUNGERING:  And I have another timeline.  This

11   is Exhibit C, Judge.

12             This is in the, relates to the 2021 adversary

13   proceeding.  And I'll try to make it brief, Your Honor.  We

14   argue the statute of limitations defense which we think is

15   very strong, and as a matter of law, Your Honor can rule in

16   our favor which would toss that whole case.

17             We also make the merits argument.  I think that's

18   pretty well laid out in our brief where we had put in the

19   evidence describing the nature of the transfers that had

20   happened.

21             On this timeline, we begin with, again, ANC

22   transaction closes in July.  This was part of a publicized

23   liquidation of ANConnect's business.  So the video business

24   went to Our Alchemy.  In the next year ANC sells its book

25   business.  And there was a press release that ANConnect issued

1  explaining the asset sale and then announcing hundreds of

2  people were losing their jobs as a result of this.  That press

3  release is actually cited in the trustee's complaint.  It was

4  a matter of public record.

5       In July of 2016, ANConnect again publicly announces

6  the sale of its music business.  And in connection with the

7  liquidation of ANConnect's business, there were transfers that

8  were being made which are part, which are now being

9  challenged.  There were transfers made up to the parent

10 Anderson Media in the amount of about two twenty something

11 million dollars.  And as is explained in Mr. Myer's

12 declaration, those amounts went to pay off the Bank of America

13 loan.  Anderson Media had purchased the note from the bank for

14 what was outstanding and then ANConnect paid that off with

15 some of the proceeds from these sales.

16      There were also payments made to a sister company,

17 Anderson Management.  So those transfers were not public, and

18 that's what the trustee complains about.  But they weren't

19 concealed.  It's just this is not a public company.

20      Well fast forward, in April of 2017 there is nothing

21 left for ANConnect to do, it was sitting on half a million

22 dollars in cash and then it would be getting in a couple more

23 million dollars because of the way these transactions were

24 structured.

25      And so there was no one left at ANConnect to handle

1  the cash management so they transferred those funds up to

2  Anderson Media.  And today, and we put in the declaration,

3  what's left of ANConnect is several hundred thousand dollars.

4  Because as this litigation has been going on, ANConnect has

5  been having to pay for lawyers.

6        And the executives at ANConnect and their counsel in

7  this case early on when the trustee filed suit, they knew that

8  there were very limited assets.  So the trustee sues ANConnect

9  in June of 2018.  And within a month or month and a half,

10 ANConnect asks for a meeting with the trustee and his counsel.

11 And there is no dispute that this meeting took place, there is

12 no dispute to the disclosures that were made which includes

13 all of the cash from the sale of ANConnect to Alchemy went to

14 pay down the Bank of America loan.

15       ANConnect then sold its remaining assets in the

16 following year and closed its operations.  All of that was

17 disclosed.

18       There is, Mr. Hominy and Mr. Miller when I deposed

19 them, they acknowledged this meeting.  They tried to downplay

20 what, you know, the significance of it.  But Mr. Hominy

21 testified money was upstreamed after liquidation or throughout

22 the liquidation.

23       He also went on to say that Grant, Grant Stein who

24 is counsel for ANConnect said a few million dollars was

25 upstreamed.  They tried to downplay the significance of that

1  amount.  The reason that they talked about the few million is

2  in that settlement conference all they were talking about is

3  what happened to the money that Alchemy paid.

4          And then Mr. Miller testified, and we put this quote

5  in the timeline, ANConnect said they believed that they were

6  going to be judgment proof.  That was on September 13th of

7  2018.

8          Now, Judge, there was an argument that it's not

9  appropriate to discuss a settlement conference.  We cite in

10  our papers there are cases, Rule 408 doesn't want us coming in

11  to use an admission in the settlement to prove a claim or

12  prove a liability.  However, there are cases that say we can

13  bring it in to show notice, some other purpose.  In this

14  instance it's that we had given the trustee enough information

15  that the trustee was on notice and should have, if he was

16  concerned about a potential fraudulent transfer, had gone and

17  acted like a reasonably diligent person would to protect his

18  rights.

19          Under the both Delaware and Texas fraudulent

20  transfer statute, they're both four year statute of

21  limitations with a one year discovery, so four years from the

22  date of the transfer or one year from the date that you knew

23  or should have known about the transfer.  All the transfers

24  that are challenged were in June and August of 2016.  This

25  case was filed in December of '21, so we're way past the four

1  years.

2        So the trustee's only saving grace would be if the

3  trustee can show that he didn't learn about it or wasn't given

4  an opportunity to learn about it.   What do we know?   There was

5  an ongoing bankruptcy, the trustee had every right to have a

6  Rule 2004 exam.   There was an ongoing adversary proceeding.

7  The trustee chose not to pursue any of those avenues to find

8  out more information.

9        The testimony from Mr. Myer on this meeting was, and

10  I confirmed with the trustee was that the trustee was given an

11  opportunity to ask questions.   And the trustee claims he asked

12  for some documents, there was never a formal request.   But we

13  think is very clear in the caselaw cited in our brief, Judge,

14  there was more than adequate notice that you have a claim.

15  And we have the <u>Zenner</u> case.   The <u>Zenner</u> case, the <u>Katel</u>

16  (phonetic) case, these are all on our brief, <u>Basic Capital</u>.

17  You have to exercise reasonable judgment.

18        And in this instance, it's a very well experienced

19  trustee and bankruptcy team and they just waited too long.

20  And we think this is the simple reason that Your Honor should

21  grant summary judgment on the remaining claim that's in this

22  case which is actual fraudulent transfer.

23        To save time, I'm not going to argue that there's

24  no, well I will assert we argue that there's no evidence of

25  actual intent to defraud because all the transfers and

1  transactions were explained and haven't been controverted.

2  But I think we should win on this statute of limitations

3  defense.

4           THE COURT:  Thank you.

5           MR. BELLI:  Thank you, Your Honor.  Mr. Hungering

6  decided to spare you his argument about why the trustee can't

7  meet the elements of the fraudulent transfer claim because

8  that's addressed in detail in the brief.

9           I'll spare you those details as well, but simply

10 stated, the brief sets forth nine badges of fraud establishing

11 that these transfers were fraudulent.

12          That brings us to their statute of reposed argument.

13 And the issue of whether or not a statute that reposes

14 limitation or statute of limitations has run is a fact

15 specific one.  And here there's a general dispute of material

16 fact as to when the the tracers could reasonably have been

17 discovered by the trustee.

18          Let's start with the only evidence they have to show

19 that the trustee was on notice of the claims before the

20 statute.  And those are the statements made in the settlement

21 discussions on December 13, 2018.  It's the trustee's position

22 that the statements made during that discussion are

23 inadmissible under rule 408(a).

24          408(a) states that evidence concerning statements

25 made during compromised negotiations "is not admissible to

1  disprove the validity or amount of a disputed claim."  And

2  that's exactly what ANConnect is trying to do here, use

3  settlement discussions to disprove the validity of the

4  trustee's claim.

5        If you read ANConnect's brief, they say that the

6  fraudulent transfer act statute of repose, it's not a mere

7  statute of limitations which is a procedural bar, but it

8  instead goes to the substance of the cause of action.

9        Its argument that settlement discussions are

10 admissible to establish a substantive statutory requirement

11 should accordingly be rejected.

12        I think the [indiscernible] case cited in the

13 trustee's brief is squarely on point.  It says you can't use

14 evidence during settlement discussions to establish when the

15 statute runs.

16        And let's look at it from a policy perspective.

17 Parties facing liability regularly cry poor during settlement

18 negotiations.  If these self-serving statements could then be

19 used to prove that the plaintiff is on notice of unspecified

20 fraudulent transfers, there's going to be a chilling effect on

21 parties' willingness to engage in settlement discussions.  And

22 there's also on the other side, there's going to be an

23 incentive for parties to lie about their finances.

24        And policy recognizes this and that's why in the

25 rules of professional conduct for, you know, the ethics of

1  lawyers, there's relaxed rules when you're discussing, you

2  know, hard numbers during settlement negotiations.

3       Even if Your Honor decides to consider the

4  statements made during the settlement discussion, Mr.

5  Hungering says there's no dispute as to what was said.  That's

6  the, the affidavit submitted by the trustee, Mr. Koren's

7  affidavit, establishes the opposite.  There's a huge dispute

8  as to what was said during this meeting.  The only agreement

9  as to what was said during this meeting is that the trustee

10 was told, oh, not much money was transferred to the parent,

11 only a million dollars or two.

12      Well, that's a flat out misrepresentation if Your

13 Honor accepts that fact that the trustee presents credible

14 evidence of.  The ANConnect representatives lied during the

15 meeting when they said that only one or two million dollars

16 was upstreamed.  They lulled the trustee into inaction because

17 the trustee is not going to go through the trouble of filing a

18 whole separate lawsuit just to get one or two million dollars.

19      They say, you know, even having been lied to, told

20 that the transfers were of an amount that's so small compared

21 to the trustee's claims in the 2018 adversary that the trustee

22 honestly had no interest in pursuing them.  Even having to

23 been lied to, the trustee should then try to get more

24 information about what it thought it already knew at this

25 point because that's what he was told.  He was told only one

1  or two million dollars was upstreamed, and that's what he

2  believed.  Why would he chase other information?

3       Even assuming he wanted to chase other information,

4  we can't just give a 2004 request.  We had already filed

5  litigation against ANConnect.  The litigation had already been

6  initiated and you know the trustee requested proof of the

7  upstreaming from ANConnect and it was denied.  The next step

8  would be to come to Your Honor and ask Your Honor to compel it

9  under Rule 2004 in which they would say oh, you know, the

10  pending proceeding doctrine, you can't use 2004 against a

11  party you've already sued.

12       Also on the point of when it could have been

13  discovered, at that stage, even in the 2018 adversary

14  proceeding, ANConnect was refusing to engage in discovery.

15  The trustee wanted to get discovery started.  And instead of

16  agreeing to that, ANConnect filed a motion for summary

17  judgment before any discovery even happened.  So they delayed

18  the process of the trustee getting formal discovery.

19       When the trustee finally did get formal discovery in

20  that 2018 action, which was in March of 2021, well under a

21  year before the suit was filed, that's how the trustee

22  discovered that you know the amounts being upstreamed, it's

23  not one or two million dollars, it's in excess of $23 million.

24  That is an amount, you know, that would warrant the steps of

25  filing this lawsuit and that's the timeline and that's how it

1  happened.

2          Mr. Hungering also mentions articles describing

3  asset sales but those articles say nothing about the

4  distribution of the proceeds, just oh, ANConnect is selling

5  assets.  The trustee cites a case, the State Farm case, says

6  that the fact that the defendant knew the defendants received

7  proceeds, that doesn't put anyone on notice of a fraudulent

8  transfer.

9          And the cases cited by defendants I submit are

10  distinguishable.  In each of them involve a plan of who had

11  actual notice before the one year statute of repose had run.

12          So thank you, Your Honor.

13          MR. HUNGERING:  Briefly, Your Honor.

14          Some of this is just because I, I am impressed with

15  the zealous advocacy but there is no reason to refer to either

16  of the gentlemen on ANConnect's behalf that were in this

17  meeting as lying.  The context of that meeting was what

18  happened to the proceeds of the sale of the ANConnect assets

19  to Alchemy.  And the cases that we cite, Zenner and Basic,

20  both of those, the plaintiff knew about the sale of an asset,

21  had the ability to go and learn more, and waited.

22          You don't need an entire, there was a lawsuit

23  pending against ANConnect and Amerge, there was not a lawsuit

24  pending against Anderson Media.  There is no reason the

25  trustee with the knowledge, with the information, even if it

1  wasn't everything the trustee wanted to know, he had an

2  opportunity to take a 2004 of Anderson Media.

3          His proof to this Court of these supposed fraudulent

4  conveyance actions are documents that were produced in

5  discovery.  There's not been any explanation as to why the

6  trustee couldn't have gotten them earlier.

7          And so, Judge, we think this is more than, there's

8  maybe a disputed fact here based on the law that we cite from

9  both Texas and the Fifth Circuit which is the appropriate law

10 to apply because ANConnect was a Texas LLC that Your Honor

11 should grant the motion for summary judgment in the 2021

12 adversary proceeding.

13          THE COURT:  Thank you.

14          All right.  Again, I'll take this one under

15 advisement as well, and issue a ruling in due course.

16          Just to make one thing clear, you're referring to a

17 statute of repose.  Constructive fraudulent transfers are

18 subject to a statute of repose because it's four years and

19 that's it.  There's no tolling or ability to toll that

20 timeframe.  Actual fraudulent transfer has a statute of

21 limitations because it has a tolling provision, one year

22 tolling from the time the party knew or should have known that

23 the transfer occurred.  So just to make sure that we're all on

24 the same page in terms of the terminology that we're using

25 when we're talking about the two different kinds of claims.

1          I think I already ruled on that issue in this case,

2     didn't I, about statute of repose versus statute of

3     limitations?

4          UNIDENTIFIED SPEAKER:  I'm not sure, Your Honor, but

5     that's our position [indiscernible].

6          THE COURT:  Okay.  It's not a statute of repose,

7     it's a statute of -- actual fraud is a statute of limitations.

8          All right.  Anything else then before we adjourn?

9          UNIDENTIFIED SPEAKER:  So, Judge, our task is for

10    opposing counsel and I to talk about a, some quick briefing

11    schedule or just to let the Court know the parties' position

12    on whether the Delaware case should go forward.

13         THE COURT:  Yes.  Just contact chambers and let me

14    know what you come up with in terms of a schedule.  If you

15    want to submit a proposed schedule under seal, that's fine.

16    And we'll go from there.  Okay?  All right.  Thank you all

17    very much.  We are adjourned.

18              (Proceedings adjourned 2:40 p.m.)

19                    *  *  *  *  *

20

1              CERTIFICATION

2          I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter to the best of our knowledge and

5   ability.

6

7   /s/ Theresa Pullan                February 14, 2024

8   Theresa Pullan, CET-780

9   Certified Court Transcriptionist

10  For Reliable

11

12

13

14

15

16